IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| RICHARD WILKINSON, | ) | No. 40061-1-III |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| THE WASHINGTON MEDICAL | ) | |
| COMMISSION, | ) | |
| | ) | |
| Respondent. | ) | |

FEARING, J. — Dr. Richard Wilkinson challenges discipline imposed on him by the Washington Medical Commission (WMC or Commission) related to his treatment of seven patients with COVID-19 and related to his clinic website's blogs downplaying the severity of the COVID pandemic, promoting the use of ivermectin over a vaccine, and criticizing the government's response to the pandemic. We separate for purposes of analysis WMC's discipline related to patient care from sanctions related to the blogs. We affirm the patient care discipline and reverse the blog sanctions. WMC's discipline of Dr. Wilkinson for his website blogs breached his First Amendment free speech rights.

FACTS

We garner the facts from findings of fact entered by the Washington Medical

Commission.  Dr. Richard Wilkinson does not challenge any of those findings.

This appeal concerns discipline meted by WMC on Dr. Richard Wilkinson,

a physician licensed to practice medicine in Washington since 1977.  Dr. Wilkinson

practices medicine at and operates Yakima's Wilkinson Wellness Clinic.

The COVID-19 pandemic presents the backdrop to this appeal.  COVID-19 is an

infectious respiratory disease.  Nearly one million people in the United States have died

because of COVID-19 since the first reporting of a COVID-19 case in Washington State

in January 2020.  COVID-19 presents a higher risk to adults 65 and older and others with

an underlying medical condition.

The drug ivermectin plays an important role in this appeal.  The Food and Drug

Administration (FDA) approved ivermectin tablets for use in humans to treat parasitic

worms and ivermectin topical formulations to treat external parasites and skin conditions.

The FDA has not approved ivermectin to treat COVID-19.  On February 4, 2021, Merck

& Co. Inc., the seller of ivermectin, released a statement regarding the use of ivermectin

to treat COVID-19.  The statement announced that Merck's scientists had identified, after

preclinical studies, no scientific basis for ivermectin having a potential therapeutic effect

against COVID-19.  Merck also warned of the lack of safety data for use of ivermectin to combat the infectious disease.

On September 22, 2021, WMC adopted a COVID-19 "Misinformation" position statement (position statement).  Admin. Rec. (AR) at 7322.  Because Dr. Richard Wilkinson attacks the supposed application of the position statement against him, we quote the statement at length.  The position statement proclaimed in part:

> The Washington Medical Commission's (WMC) position on COVID-19 prevention and treatment is that COVID-19 is a disease process like other disease processes, and as such, treatment and advice provided by physicians and physician assistants will be assessed in the same manner as any other disease process.  Treatments and recommendations regarding this disease that fall below standard of care as established by medical experts, federal authorities and legitimate medical research are potentially subject to disciplinary action.
> The WMC supports the position taken by the Federation of State Medical Boards (FSMB) regarding COVID-19 vaccine misinformation. The WMC does not limit this perspective to vaccines but broadly applies this standard to all misinformation regarding COVID-19 treatments and preventive measures such as masking.  Physicians and Physician Assistants, who generate and spread COVID-19 misinformation, or disinformation, erode the public trust in the medical profession and endanger patients.
> The WMC will scrutinize any complaints received about practitioners granting exemptions to vaccination or masks that are not based in established science or verifiable fact.  A practitioner who grants a mask or other exemption without conducting an appropriate prior exam and without a finding of a legitimate medical reason supporting such an exemption within the standard of care, may be subjecting their license to disciplinary action.
> The WMC bases masking and vaccination safety on expert recommendations from the U.S. Centers for Disease Control and Prevention (CDC) and the Washington State Department of Health (DOH).

3

> The WMC relies on the U.S. Food and Drug Administration approval of medications to treat COVID-19 to be the standard of care. While not an exhaustive list, the public and practitioners should take note:
> • Ivermectin is not FDA approved for use in treating or preventing COVID-19
> • Hydroxychloroquine (Chloroquine) is not FDA approved for use in treating or preventing COVID-19
> The public and practitioners are encouraged to use the WMC complaint forms when they believe the standard of care has been breached.

AR at 7322 (alterations in original).

From June 2020 through May 2022, Dr. Richard Wilkinson maintained a website blog that posted medical information to the public. The public accessed the blog only through the Wilkinson Wellness Clinic website. Many, if not most, of the blog postings from 2020 through 2022 address the topic of COVID-19. A comment on the blog states Dr. Wilkinson's messages seek to "help my patients understand more about this disease [COVID-19]." AR at 6845. During the WMC evidentiary hearing, Dr. Wilkinson testified he desired to share, on the blog, his views on the disease.

Dr. Richard Wilkinson posted on his clinic's blog, the following statements that form a basis for discipline against Dr. Wilkinson:

> The COVID-19 pandemic is a scam;

> Polymerase chain reaction (PCR) testing and the use of masks to reduce the spread of COVID-19 infection are useless;

> Public health entities, including the Food and Drug Administration, the Washington State Department of Health, and the Yakima County

4

Health Department, are providing false information and are not to be trusted;

Ivermectin is effective in preventing or treating a COVID-19 infection; and

COVID-19 vaccines are dangerous and kill people, comparing the push for vaccination with the murder of Jewish people in Nazi-era Germany.

AR at 4988 (findings of fact 1.8.1-1.8.5).

Between August and December 2021, WMC received complaints alleging unprofessional conduct by Dr. Richard Wilkinson regarding his treatment of patients with COVID-19. WMC investigated the complaints and ultimately charged Dr. Wilkinson with unprofessional conduct in violation of the Uniform Disciplinary Act (UDA), chapter 18.130 RCW, including providing negligent care to patients.

During the disciplinary hearing, WMC heard testimony concerning seven of Dr. Richard Wilkinson's patients, Patients A through G. We describe their symptoms, diagnoses, and treatments administered by Dr. Wilkinson. All of Dr. Richard Wilkinson's patients who testified stated they had never read his clinic website blog.

*Patients A and B*

Patients A and B, a married couple, were longtime patients of Dr. Wilkinson. Both husband and wife were age 84 in August 2021. On August 11, 2021, their daughter called the Wilkinson Wellness Clinic and reported concerns that they might be sick with

COVID-19.  Both had suffered fevers for three days.  On August 11, Dr. Wilkinson

spoke with Patient B on the telephone and prescribed both Patients A and B medications,

including ivermectin.  He did not physically see Patients A or B and did not talk to their

daughter during the phone call.  Dr. Wilkinson did not disclose to Patient B that the FDA

had not approved ivermectin for COVID-19.  Wilkinson did not explore alternative

treatments with Patient B.  Wilkinson did not document that he obtained informed

consent from either Patient A or B regarding use of ivermectin.

Dr. Scott Lancaster, who treated Patient at the hospital, testified at the WMC

evidentiary hearing, that Patient B and her spouse, Patient A, arrived in serious condition.

Dr. Lancaster averred that he would not have prescribed ivermectin for these patients to

treat COVID-19 because the antiparisitic drug was not an evidence-based treatment for

COVID.

*Patient C*

Patient C was 17 years old in August 2021.  Patient C had a history of

hypertension, obesity, and asthma, and was not vaccinated against COVID-19.  On

August 28, 2021, he experienced COVID-19 symptoms, including a cough and shortness

of breath.  His mother took him to the hospital where he tested positive for COVID-19.

Following a normal chest x-ray, the hospital discharged Patient C with prescriptions for

albuterol, benzonatate, ibuprofen, losartan, and ondansetron.  Patient C returned to the

6

hospital on August 30 but was discharged with dexamethasone after being stabilized and determined not to be in respiratory distress.

Dr. Richard Wilkinson saw Patient C at his clinic on August 31. Dr. Wilkinson performed a physical examination, but his chart notes do not record the taking of vital signs. Dr. Wilkinson prescribed a variety of medications, including ivermectin, zinc, and nebulized hydrogen peroxide. Dr. Wilkinson failed to document his medical decision-making, a sufficient rationale for the prescribed medications, or having obtained informed consent. The chart notes do not mention whether Dr. Wilkinson provided Patient C or his mother with evidence supporting off-label use of ivermectin or warned them that inhaled hydrogen peroxide has no effect on a COVID-19 infection and is dangerous. Later that same day, Patient C's oxygen saturation at home lowered to 85 percent, and his mother returned him to the hospital emergency room.

At the hospital on August 31, Patient C was hypertensive, had a pulse rate of 108, and oxygen saturation levels between 88 and 92 percent. The emergency room administered supplemental oxygen, which resolved the hypertension and increased the pulse. His mother chose to have him discharged, but he eventually returned to the hospital, where treatment providers admitted him with a diagnosis of hypoxia and COVID-19 infection. Two days later, he was discharged home with increased supplemental oxygen, dexamethasone, albuterol, losartan, acetaminophen, and ibuprofen.

Dr. Jeremy Hutchins testified he treated Patient C at the hospital in 2021. By then, the FDA had approved remdesivir and monoclonal antibodies as effective treatment for COVID-19. Studies also demonstrated that ivermectin and other medications prescribed by Dr. Wilkinson for COVID were not effective. Hutchins disclosed that he instructed patients that, if they required more than two liters of supplemental oxygen, they should return to the hospital because that amount signaled progression of the disease.

*Patient D*

65-year-old Patient D was not vaccinated against COVID-19 and had a history of tobacco use. The hospital admitted him on October 27, 2021 after he experienced shortness of breath and flu-like symptoms for several days.

Patient D's oxygen saturation was only 85 percent, but his levels improved when given supplemental oxygen and dexamethasone. He tested positive for COVID-19. A physician diagnosed him with acute respiratory failure and hypoxia due to viral pneumonia. Patient D refused treatment with remdesivir and baricitinib, but he and his wife requested ivermectin and indicated they had a supply of ivermectin at home. Medical providers at the emergency room refused to give Patient D ivermectin to treat COVID-19. On October 28, Patient D left the hospital against medical advice.

Dr. Richard Wilkinson saw Patient D on October 28, the same day he left the hospital. His chart notes indicate Patient D was taking ivermectin. Dr. Wilkinson

prescribed Patient D ivermectin at 18 mg per day for five days, then once a day "'until

doing better,'" but the notes do not explain what "doing better" means. AR at 4993. Dr.

Wilkinson also prescribed other medications, including nebulized budesonide, heparin,

zinc, and melatonin. Dr. Wilkinson's chart notes lack the following information: a

sufficient rationale for prescribing the medications for Patient D, that Wilkinson

disclosed that he prescribed an off-label use of ivermectin to the patient, and that

Wilkinson had obtained informed consent. The record also failed to document an

adequate history or physical examination. Dr. Wilkinson's notes consist of a billing code

for COVID-19.

Patient D returned to the hospital emergency department on November 3 with

shortness of breath, cough, fever, muscle pain, and headache. His oxygen saturation level

was 90 percent. The emergency room diagnosed Patient D with acute hypoxic

respiratory failure. The emergency room admitted him to the hospital, where he told staff

he had been taking ivermectin and supplemental oxygen at home but his symptoms had

worsened.

Dr. Steven Richards, who treated Patient D, testified that he first saw Patient D on

November 3, after Patient D left the hospital against medical advice and then returned.

Patient D was "acutely hypoxic" whenever he ended the high-flow supplemental oxygen

he required. At the time he returned to the hospital, he was "out the window" for any

treatment with remdesivir, budesonide, or baricitinib, so the hospital administered

dexamethasone and a BiPAP (bilevel positive airway pressure), a ventilator that

administers two levels of air pressure to assist in both inhaling and exhaling. AR at

7412-13, 7415. Patient D told Dr. Richards that he previously left the hospital, despite

his need for six liters of supplemental oxygen to maintain an oxygen saturation level at

90 percent, at the advice of his primary care physician so he could receive ivermectin and

other therapies. Dr. Richards testified hospital staff struggled to obtain Patient D's

acceptance of other therapies. Patient D could not safely return home when he left

against medical advice given the amount of supplemental oxygen he needed. On

November 14, Patient D died at the hospital from pneumonia due to the COVID-19 virus.

*Patient E*

56-year-old obese Patient E also had not been vaccinated against COVID-19.

Patient E was admitted to the hospital on September 8, 2021, with abdominal pain,

nausea, dizziness, fever, and anorexia. She had experienced oxygen saturation levels in

the 80s at home. Patient E was diagnosed with COVID-19 and was given intravenous

fluids and Zofran. She declined treatment with monoclonal antibodies. The hospital

discharged her the same day after her vital signs improved. The hospital instructed

Patient E to follow up with her primary care physician and return to the hospital if her

condition worsened.

Later, on September 8, Patient E had a virtual medical visit by Zoom with Dr. Richard Wilkinson. Patient E reported that she had been at the hospital with COVID-19, she had declined monoclonal antibodies, and she had been taking ivermectin, vitamin D, zinc, and nebulized hydrogen peroxide. Dr. Wilkinson prescribed ivermectin, zinc, and aspirin. Dr. Wilkinson failed to document in his chart an appropriate history of or his medical decision-making for Patient E.

Patient E returned to the hospital on September 9 complaining of shortness of breath, coughing, fatigue, fever and chills. She was diagnosed with acute hypoxic respiratory failure and pneumonia due to COVID-19. After being admitted to the hospital, she received dexamethasone and supplemental oxygen. The hospital discharged her on September 15.

*Patient F*

Patient F was 91 years old when he visited with Dr. Richard Wilkinson via Zoom on December 3, 2021. Dr. Wilkinson's clinical notes did not record the nature of the visit being virtual. Dr. Wilkinson had never seen or treated Patient F before the December 2021 virtual visit. Patient F and his spouse reported that Patient F had been exposed to COVID-19, he had a cough and fever of 103 degrees Fahrenheit, that his oxygen saturation level at the time of the visit was 92 percent, but the level had plummeted to 82

percent earlier that morning. Patient F denied any trouble breathing or shortness of breath.

Dr. Wilkinson's chart notes indicate that Patient F reported taking ivermectin paste on a daily basis. Ivermectin paste is a veterinary formulation intended for use by nonhumans and is dangerous when used by humans. Patient F reported experiencing diarrhea, and his spouse reported Patient F acted once as if having a seizure or the shakes. Dr. Wilkinson did not instruct Patient F to stop taking ivermectin paste. He did not ask Patient F if he was vaccinated against COVID-19.

Dr. Richard Wilkinson diagnosed Patient F with COVID-19 and prescribed ivermectin "'until doing pretty well.'" AR at 4996-97. Dr. Wilkinson wrote "'informed consent re ivermectin'" in his chart notes, but the notes did not document that Wilkinson warned Patient F of off-label use of ivermectin. AR at 4997. He prescribed Patient F other medications including supplemental oxygen, prednisone, zinc, and vitamin C. He did not document a sufficient rationale for any of the medications he prescribed to Patient F. Dr. Wilkinson also failed to document Patient F's medical history or what medications he was currently taking other than ivermectin paste.

Patient F had numerous existing medical issues, including dementia, hypertension and atrial fibrillation. He wore an indwelling, double-chamber pacemaker. Patient F was also taking a blood thinning medication. Although the combination of a blood thinner

and prednisone presents an increased risk of bleeding, Dr. Wilkinson did not document this risk. The documented assessment for Patient F consists only of a billing code for COVID-19.

In following days, Dr. Richard Wilkinson directed Patient F to receive higher and higher doses of supplemental oxygen at home. Eventually, Patient F received a flow rate of 24 liters per minute. Dr. Wilkinson did not document the rationale for the higher dose or document his medical decision-making process.

Patient F traveled to the hospital on December 10 with respiratory distress. According to Dr. Scott Lancaster, Patient F arrived at the hospital extremely ill. His oxygen saturation was 62 percent, and hospital staff placed him on bilevel positive airway pressure. The hospital admitted Patient F after diagnosing him with acute hypoxic respiratory failure due to COVID-19 pneumonia. He received dexamethasone and albuterol, but Patient F and his family refused treatment with baricitinib. Baricitnib, an immunomodulatory medication employed to decrease inflammation, decreased mortality, especially when combined with dexamethasone. Patient F's condition worsened, and he died on February 17, 2022.

*Patient G*

Patient G, who was married to Patient F, was 87 years old in December 2021. She visited the Wilkinson Wellness Clinic on December 8 with a fever and low oxygen

saturation levels. Patient G reminded Dr. Wilkinson that her husband had a COVID-19 infection and that she took ivermectin paste. Dr. Wilkinson assumed Patient G had COVID-19 based on her symptoms and the fact that her spouse had the infection. According to his notes, Wilkinson prescribed ivermectin "'until doing pretty well,'" but did not document what "'pretty well'" meant. AR at 4998. He also prescribed prednisone and zinc. Dr. Wilkinson did not document a rationale for prescribing the medications. Wilkinson documented a scant medical history for Patient G. He failed to document whether he obtained informed consent from Patient G regarding her treatment regimen or whether he warned her of the off-label use of ivermectin.

On December 11, 2021, Patient G reported to the hospital with shortness of breath and an oxygen saturation level of 86 percent. The hospital admitted her for acute hypoxic respiratory failure due to COVID-19 pneumonia. She received dexamethasone and supplemental oxygen in the hospital, and providers refused her request for ivermectin. She recovered sufficiently after six days to be released from the hospital.

Dr. John Maxwell, who treated Patient G, testified that she required supplemental oxygen when admitted to the hospital. He filed a complaint with the WMC because Dr. Richard Wilkinson provided inappropriate care by prescribing Patient G unproven treatments, including ivermectin and nebulized hydrogen peroxide, especially when both Patient G and her husband Patient F were unvaccinated. Maxwell testified that, for

Patient G, the time had passed for possible treatment with remdesivir, which G refused anyway, but the hospital administered dexamethasone. G gradually improved.

Dr. Maxwell testified that he reviewed studies regarding the use of ivermectin to treat COVID-19 because it showed promise early in the pandemic, but treatment paradigms and treatment options changed during the first year. He never prescribed ivermectin due to the development of other treatments demonstrated to be effective, including steroids, monoclonal antibodies, and vaccination. He averred:

> And so, you know, the biggest complaint I have about ivermectin and Dr. Wilkinson's blog is that it creates this idea that the pandemic wasn't real, you know, that the tests were—the government didn't have a good way of testing for it, that patients were not really dying from it, that the deaths were overcounted, and that the deaths were happening a lot more with vaccines than are being reported, so it kind of flipped the script.
> And I feel like using ivermectin to say you don't need the vaccine because ivermectin will help you is—you know, was misleading. I don't think there is much harm with ivermectin, honestly. I think the only bad side effect I've seen a patient have was an interaction with a medication that caused bleeding, warfarin, but I don't think it does anything like—so I think it puts misplaced trust in that they are being treated for something, and then—
> Q You are saying that the harm from ivermectin is somebody thinking that they would be protected and would not get the vaccine because of that?
> A I think that and also just treatment and delaying hospitalization. She was on oxygen by the time she came in. She should have ideally had some monoclonal antibodies earlier on when she was sick, in my opinion.

AR at 7444-45.

PROCEDURE

On June 7, 2022, WMC served a statement of charges against Dr. Richard Wilkinson. The charges alleged that Dr. Wilkinson published false and misleading statements on his public website regarding the COVID-19 pandemic, COVID-19 vaccines, and public health officials. Those misleading statements harmed and endangered individual patients, generated mistrust in the medical profession and in public health, and negatively impacted the health of Washington residents. The charges also alleged that Dr. Wilkinson provided negligent care to Patients A-G when treating COVID-19 infections.

The statement of charges against Richard Wilkinson concluded that Dr. Wilkinson committed unprofessional conduct in violation of RCW 18.130.180(1), (4), and (13). Those sections of the Washington's version of the Uniform Disciplinary Act (UDA) declare:

> RCW 18.130.180 Unprofessional conduct. The following conduct, acts, or conditions constitute unprofessional conduct for any license holder [physician] under the jurisdiction of this chapter:
> (1) The commission of any act involving moral turpitude, dishonesty, or corruption relating to the practice of the person's profession, whether the act constitutes a crime or not. . .;
> . . . .
> (4) Incompetence, negligence, or malpractice which results in injury to a patient or which creates an unreasonable risk that a patient may be harmed. The use of a nontraditional treatment by itself shall not constitute

16

>unprofessional conduct, provided that it does not result in injury to a patient or create an unreasonable risk that a patient may be harmed;
>
>. . . .
>
>(13) Misrepresentation or fraud in any aspect of the conduct of the business or profession.

AR at 14 (boldface omitted). The charges sought sanctions against Dr. Wilkinson under RCW 18.130.160. Dr. Richard Wilkinson denied all allegations asserted in the WMC's statement of charges.

Before the evidentiary hearing, Dr. Richard Wilkinson filed a motion to dismiss those charges relating to his website posts. He asserted that those charges violated his right to free speech under the First Amendment to the United States Constitution. In response, WMC highlighted that it lacked authority to declare any sections of the UDA invalid. As to the merits, WMC contended that (1) the First Amendment did not protect false commercial speech or false medical advice by a physician to patients or prospective patients, (2) Dr. Wilkinson's blog posts, which constituted medical advice directed at his patients and health care consumers, was the "practice of medicine" under RCW 18.71.011, and (3) WMC had compelling interests to protect the public from COVID-19 by executing its legislative mandate to apply content-neutral statutes to discipline unprofessional conduct by physicians spreading COVID-19 misinformation as medical advice.

17

WMC's presiding officer denied Dr. Richard Wilkinson's motion to dismiss. The officer reasoned that WMC lacked authority to declare any statute unconstitutional. The officer added that the charges needed an evidentiary hearing because they pertained to the standards of practice, which required the clinical expertise of the Commission members.

A five-day hearing occurred before a hearing panel consisting of three WMC members between April 3-7, 2023. The Commission presented testimony from five physicians who treated Patients A-G in the hospital and from three expert witnesses: Dr. Raymond Scott McClelland, Dr. Anna Wald, and Dr. Dawn Nolt. Dr. Wilkinson testified on his own behalf. Wilkinson presented testimony from Patient E as well as friends and family members of Patients A-G, and expert testimony from a pharmacist and a naturopathic physician, both who cared for some of the subject patients. Finally, medical expert Dr. Frank Shallenberger, III, testified for Dr. Wilkinson.

Dr. Dawn Nolt testified about the literature available to a reasonably prudent physician in 2021. In the summer to fall of 2021, a reasonably prudent physician would not have prescribed ivermectin for the treatment of COVID-19.

Dr. Anna Wald identified the false statements in Dr. Richard Wilkinson's blog and listed the articles on which she relied to form her opinion. She cited to multiple peer-reviewed studies concluding that ivermectin is not an effective treatment for COVID-19. Dr. Wald opined that the information on Dr. Wilkinson's blog was verifiably false. The

disinformation endangered patients and the public by dissuading vulnerable people from taking treatments or other effective prevention and treatment modalities.

Dr. Raymond McClelland testified regarding Dr. Richard Wilkinson's care of Patients A, B, D, and E, whose files he reviewed. He opined that no medical reason supported prescribing nebulized hydrogen peroxide for COVID-19 and that the substance can cause patients to experience reactions similar to pneumonitis. He added that Dr. Wilkinson should have administered monoclonal antibodies for Patients A and B if they were well enough to stay outpatient.

Dr. Raymond McClelland noted that the most effective COVID-19 treatments, including monoclonal antibodies, remdesivir or baricitinib, are most effective when administered within ten days of the onset of the viral disease. McClelland testified:

> So among my biggest concerns with starting with a course of ivermectin, which has no proven benefit, is that people are getting further and further out from the time points at which they really could be helped the most by treatments that have been shown to reduce morbidity, particularly in terms of things like progression to ventilation, duration of hospitalization and then mortality.

AR at 7574-75. He worried that a patient receiving ivermectin may conclude they need no other medications, especially if the physician fails to discuss with the patient other effective medications.

Dr. Raymond McClelland further testified:

19

I think that this patient—and indeed, all of these patients, clearly have a belief in these treatments and, you know, that's the sad place that we have arrived at is that people are generating beliefs about medical treatments that align with their political positions and I think that's sad. And clearly, you know, in all of these cases, these are people who believe that this is what they need because that's what they are getting from the media.

. . . .

What I see with Dr. Wilkinson is somebody who really has the trust of these patients and what troubles me the most is that instead of providing them with the best available information based on real medical evidence, he is essentially feeding their preconceived notions, which are based on conspiracy theories, about the pandemic, about what prevents COVID, about how to treat COVID. . . .

AR at 7601-02.

In August 2023, the WMC hearing panel issued a 35-page final order that included findings of fact and conclusions of law. The findings included assessments of the credibility of the witnesses. The panel deemed the physicians who treated Patients A-G at the hospital, Scott Lancaster, Jeremy Hutchins, Steven Richards, John Maxwell, and Jasper Fernandez, "extremely credible." AR at 4999. The information and context provided by these physicians highlighted the consequences of Dr. Richard Wilkinson's actions and demonstrated the Dr. Wilkinson's distance from the appropriate standard of care for COVID-19 patients.

The WMC hearing panel found the Commission's three expert witnesses highly qualified in the fields of infectious disease and public health. The panel accorded the experts' testimony "great weight." AR at 5000 (finding of fact 1.46).

The hearing panel concluded that the testimony of Patient E, the family and friends of Dr. Wilkinson's patients, pharmacist David Arnold, and Dr. Akiko Kato did not assist in resolving whether Dr. Wilkinson committed unprofessional conduct as alleged. The Commission gave little weight to the testimony of Dr. Wilkinson's expert, Dr. Frank Shallenberger, because of his lack of knowledge of research regarding treatment of COVID-19 patients. Medical licensing authorities in Nevada and California had previously disciplined Shallenberger.

The WMC panel found Dr. Wilkinson's testimony biased toward his own points of view. He formed opinions about COVID-19 based on his own interpretations of data and would not consider alternate viewpoints. Dr. Wilkinson forwarded insufficient and uncredible rationales for the care of his patients.

In addition to finding that Dr. Richard Wilkinson violated the standard of care of a medical physician with regard to Patients A-G, WMC concluded Dr. Wilkinson violated the law with his COVID-related blog postings. According to WMC, the postings on the website constituted the practice of medicine. WMC, in its findings of fact, wrote:

21

<u>The Respondent's [Dr. Richard Wilkinson's] Public Statements</u>

1.6 The Respondent made numerous false and misleading statements on his blog regarding the COVID-19 pandemic, COVID-19 vaccines, and public health officials. These statements—which in context can only be characterized as constituting the practice of medicine—were harmful and dangerous to individual patients, generated mistrust in the medical profession and in public health, and had a widespread negative impact on the health and well-being of the community.

1.7 Much of the information that the Respondent spread via his blog was not factual, scientifically grounded, or consensus driven. However, due to their specialized knowledge and training, licensed physicians possess a high degree of public trust and therefore have a powerful platform in society. Physicians also have an ethical and professional responsibility to practice medicine in the best interests of their patients and must share information that is factual, scientifically grounded, and consensus-driven for the betterment of the public. When physicians spread inaccurate information and rely on their status as licensed physicians to bolster their message, it is especially harmful as it threatens the health and well-being of the community and undermines public trust in the profession and established best practices in care. *See* Exhibit D-41. Here, the Respondent spread inaccurate information via his blog, relying on his status as a physician to spread the misinformation.

AR at 4987-88.

Based on its findings of fact and conclusions of law, the WMC panel ruled that Dr. Richard Wilkinson violated RCW 18.130.180(1), (4), and (13). Dr. Wilkinson violated RCW 18.130.180(1) as follows:

Here, the Respondent's presentations presented an extremely unbalanced look at COVID-19, downplaying the seriousness of COVID-19. The claims that medical records were falsified by hospitals undermines trust in the healthcare system and may delay patients from seeking necessary care. Similarly, the Respondent's posts about masks were likely

to lead to people being less likely to wear masks when they should have been.

The Respondent also significantly misrepresented information about COVID vaccines. This included claims that COVID vaccines could cause birth defects and infertility, and that somehow COVID vaccines were not really vaccines. In addition, the Respondent's comparison of COVID vaccines to the mass murder of Jewish people in the Holocaust was objectively untrue and patently offensive. The Respondent has clearly violated commonly accepted standards of honesty. All of this behavior raises concerns that the Respondent may use his professional position as a physician to harm members of the public. It also tends to lower the standing of physicians in the eyes of the public. Consequently, his actions "relate to" the medical profession. Consequently, the Commission has proved by clear and convincing evidence that the Respondent committed unprofessional conduct as defined in RCW 18.130.180(1).

AR at 5003-04 (conclusion of law 2.5).

WMC ruled that Dr. Wilkinson violated RCW 18.130.180(4) by:

As amply demonstrated in the Findings of Fact above, the Respondent failed to meet the standard of care for Patients A, B, C, D, E, F, G, and H. This included failure to provide appropriate care for the treatment of COVID-19, failure to keep appropriate medical records, and failure to get informed consent for the treatment that the Respondent provided (including a persistent failure to engage in an informative discussion of the off-label use of ivermectin with his patients). Consequently, the Commission has proved by clear and convincing evidence that the Respondent has committed unprofessional conduct under RCW 18.130.180(4).

AR at 5004 (conclusion of law 2.6).

According to WMC, Dr. Richard Wilkinson violated RCW 18.130.180(13) when:

23

2.8 As noted above, the Respondent's presentation contained multiple falsehoods about COVID-19. The Respondent knew (or as a reasonably prudent physician, should have known) that much of the information he was presenting about COVID-19 was a misrepresentation of the true facts. Consequently, the Commission has proved by clear and convincing evidence that the Respondent violated RCW 18.130.180(13).

AR at 5005 (conclusion of law 2.8).

When issuing discipline against a physician, WMC pegs the physician's conduct into one of six schedules found in WAC 246-16-810 to -860. In turn, the severity of the discipline, within each schedule, depends on the harm caused by the conduct. Each tier declares a maximum and minimum sanction range. The WMC panel determined that Dr. Richard Wilkinson's conduct fell under "Tier B" of the "Practice Below Standard of Care" schedule found in WAC 246-16-810. Tier B encompasses conduct that caused moderate patient harm or caused a risk of severe patient harm. WMC then specifies the discipline, within the stated range, after reviewing aggravating and mitigating factors outlined in WAC 246-16-890. When disciplining Dr. Wilkinson, WMC found the following aggravating factors: Dr. Wilkinson engaged in the dissemination of false information, the unprofessional conduct impacted multiple patients, Dr. Wilkinson had a prior disciplinary history, and Dr. Wilkinson misrepresented his disciplinary history during the investigative process. The Commission also considered the mitigating factor

24

that Dr. Wilkinson had a long history of medical practice that revealed potential for successful rehabilitation.

WMC imposed multiple sanctions including:

1. placing Dr. Wilkinson's license on probation for at least 5 years;

2. restricting his practice during the probationary period by restricting Dr. Wilkinson from prescribing ivermectin for non-FDA-approved indications and restricting him from prescribing medication or care to patients without first taking a number of enumerated steps, including establishing a physician/patient relationship, taking an appropriate history and obtaining informed consent;

3. requiring him to undergo a clinical competency evaluation within 6 months that includes an assessment by the Physician Assessment and Clinical Education (PACE) program at the University of California San Diego School of Medicine, with such assessment to include screening examinations, including at a minimum a history and physical, as well as cognitive and psychological screening;

4. requiring him to successfully complete continuing medical education (CME) courses on enumerated topics within 6 months;

5. requiring him to submit to compliance audits on an annual basis, which will include an inspection of patient records and may include various office records as well as interviews of Dr. Wilkinson and staff;

6. requiring Dr. Wilkinson to personally appear within 12 months at a date and time determined by the Commission;

7. requiring Dr. Wilkinson to submit personal written reports within 30 days of the decision and thereafter every 6 months; and

8. requiring Dr. Wilkinson to pay a $15,000 fine within 9 months of the Order.

AR at 5006-11.

Dr. Richard Wilkinson subsequently filed a petition for judicial review in superior court. The superior court transferred the petition to this court for direct review under RCW 34.05.518.

## LAW AND ANALYSIS

On appeal, Dr. Richard Wilkinson assigns eight errors to WMC's decisions, some of which overlap. First, WMC should have, but refused, to address his First Amendment challenge to the Commission's disciplinary action based on his blog posts. Second, WMC found that he violated the UDA without clear and convincing evidence. Third, WMC disciplined him based on its position statement and thereby imposed a prior restraint of speech. Fourth, WMC violated his First Amendment rights when disciplining him for his posts. Fifth, WMC retaliated against him for exercising his free speech rights. Sixth, WMC selectively enforced the provisions of the UDA against him and isolated him for sanctions. Seventh, WMC neglected to provide him advance notice of the possible discipline of submitting to the Physician Assessment and Clinical Education (PACE) program at the University of California San Diego School of Medicine and later denied him the opportunity to challenge the discipline after its having been ordered. Eighth, the discipline imposed on Wilkinson exceeded WMC's statutory authority.

We first address assignment of error two, which relates to whether WMC presented clear, cogent, and convincing evidence to prove that Dr. Richard Wilkinson violated the UDA. We amalgamate assignments of error one, three, four, five, and six, and we address these five assignments under one discussion concerning the constitutionality of disciplining Dr. Wilkinson for posts on his blog. We often encounter difficulty determining when Wilkinson challenges WMC's action based on statutory law or on the First Amendment. Wilkinson sometimes runs the two arguments together. Finally, we merge assignments of error seven and eight when discussing the validity of the disciplinary action taken against Dr. Wilkinson.

Evidence of Statutory Violations

When challenging the imposed discipline, Dr. Richard Wilkinson contends that WMC failed to furnish clear, cogent, and convincing evidence, as required by RCW 18.130.180(4), that he violated any physician's standard of care that resulted in injury to a patient or created an unreasonable risk of harm to a patient. According to Dr. Wilkinson, WMC instead based its ruling on conclusory allegations, not a thorough review of all evidence. Wilkinson insists that WMC's findings do not explain what actions he took that injured or perpetrated an unreasonable risk of harm to any identifiable patient.

27

Dr. Richard Wilkinson assigned no error to WMC's findings of fact. We treat unchallenged findings as established facts. RAP 10.3(g); *Inland Foundry Co., Inc. v. Department of Labor & Industries*, 106 Wn. App. 333, 340, 24 P.3d 424 (2001).

With regard to issues of fact, this court reviews the evidence submitted to determine whether it constituted substantial evidence to support the factual findings of the agency. RCW 34.05.570(3)(e). Substantial evidence persuades a fair-minded person of the truth of the declared premise. *Ames v. Medical Quality Assurance Commission*, 166 Wn.2d 255, 261, 208 P.3d 549 (2009). Medical review boards may rely on their own expertise in evaluating medical practices. *Washington Medical Disciplinary Board v. Johnston*, 99 Wn.2d 466, 482, 663 P.2d 457 (1983).

Evidence is substantial if it is sufficient to persuade a reasonable person of the truth or correctness of the order. *Ancier v. Medical Quality Assurance Commission*, 140 Wn. App. 564, 572-73, 166 P.3d 829 (2007). This court takes the Commission's evidence as true and draws all inferences in WMC's favor. *Ancier v. Medical Quality Assurance Commission*, 140 Wn. App. 564, 573 (2007). The hearing board weighs the credibility of the evidence. In contrast, a court reviewing an agency finding for substantial evidence does not make an independent evaluation of the credibility of the evidence. *Alaska Airlines, Inc. v. Department of Labor & Industries*, 1 Wn.3d 666, 685-

86, 531 P.3d 252 (2023). WMC found the Commission's witnesses credible, while Dr.

Wilkinson and his witnesses lacked believability.

Based on its findings of fact and conclusions of law, WMC ruled that Dr. Richard

Wilkinson violated RCW 18.130.180(1), (4), and (13). In his brief, Wilkinson only

challenges the ruling that he violated subsection (4). That subsection reads:

> [T]he following conduct, acts, or conditions constitute
> unprofessional conduct for any license holder under the jurisdiction of this
> chapter:
> . . . .
> (4) Incompetence, negligence, or malpractice which results in injury
> to a patient or which creates an unreasonable risk that a patient may be
> harmed. The use of a nontraditional treatment by itself shall not constitute
> unprofessional conduct, provided that it does not result in injury to a patient
> or create an unreasonable risk that a patient may be harmed.

RCW 18.130.180.

WMC ruled that Dr. Richard Wilkinson practiced medicine negligently and

thereby violated RCW 18.130.180(4), when treating Patients A, B, C, D, E, F, and G, by

failing to maintain detailed medical records, neglecting to garner informed consent when

prescribing treatment for COVID-19, and overlooking an informative discussion of the

off-label use of ivermectin with patients. A thorough review of the record establishes

that WMC proved by clear and convincing evidence, if not overwhelming evidence, that

Dr. Wilkinson committed acts of malpractice. The patient records reflected that Dr.

Wilkinson failed to provide these patients with a proper informed consent, which would

have included "a discussion of the possible alternative treatments for a COVID-19 infection; and a discussion of the recognized risks, as well as the potential complications and anticipated benefits of taking ivermectin for a COVID-19 infection," as well as documentation that Dr. Wilkinson informed the patients that the FDA had not approved ivermectin for a COVID-19 infection and that the prescribing of ivermectin was off-label. AR at 4989.

WMC experts testified that, in the summer to fall of 2021, a reasonably prudent physician would not have prescribed ivermectin to treat COVID-19. The effective treatments for COVID-19 were most effective when given as soon as possible after onset of illness. The effective treatments should have been administered within ten days after onset to be administered. If a physician prescribes ivermectin or other ineffective treatments, the physician places the patient in danger because the patient erroneously believes the physician is effectively treating the COVID-19 and the patient delays seeking effective treatment.

Dr. Richard Wilkinson may focus his challenge on a finding that fulfilled a portion of subsection (4) of RCW 18.130.180, that requires his conduct to have injured a patient or created an unreasonable risk of harm to a patient. We conclude that WMC made this finding based on clear and convincing evidence.

30

WMC found that since January 22, 2020, nearly one million Americans had died because of COVID-19. WMC also found that people over 65 years of age and people with underlying medical conditions are at a higher risk for more severe illness from COVID-19. All of Dr. Richard Wilkinson's patients were either over 65 years of age or had other risk factors making them more susceptible to the COVID virus. WMC witnesses testified that ivermectin did not treat COVID-19. Dr. Dawn Nolt testified that, in the summer to fall of 2021, a reasonably prudent physician would not have prescribed ivermectin. Dr. Wilkinson prescribed ivermectin, despite ivermectin's maker having declared that the drug should not be prescribed for COVID. Dr. Wilkinson did not know that studies about ivermectin, on which he relied, had been retracted as scientifically unreliable. Patients of Wilkinson confirmed that he advised against remdesivir and baricitinib, two of the most effective COVID-19 medications according to WMC's physician and expert witnesses.

Dr. Wilkinson prescribed Patients C, D and G nebulized hydrogen peroxide to treat COVID-19. Dr. Raymond McClelland testified that no medical basis existed for prescribing nebulized hydrogen peroxide. To the contrary, McClellan opined that prescribing the hydrogen peroxide posed a potential risk to patients' health as some patients may contract pneumonitis. Dr. Richard Wilkinson prescribed Patient F prednisone but failed to document Patient F took other medications including a blood

thinning medication. Wilkinson also failed to document that Patient F was at an increased risk of bleeding caused by the combination of prednisone and blood thinner.

With respect to Patient D, Dr. Raymond McClelland noted that a prudent physician would have recommended returning him to the hospital because of the risk of death. McClelland opined that, during the time that Patient D was treated by Dr. Wilkinson, he remained in the window to be treated by remdesivir and baricitinib, and these treatments may have saved Patient D's life. He noted that physicians encounter difficulty in conversing with some patients about COVID-19 treatments because of the polarization around COVID-19. Nevertheless, according to Dr. McClelland, the physician possessed a duty to confirm that patients understood treatment options. Dr. McClelland added that, even if Patient D had previously refused effective treatments at the hospital, Dr. Wilkinson held a duty to explain that failing to return to the hospital and take the effective treatments increased Patient D's risk of serious illness or death. If Patient D still decided to render a decision not in his best interest, he did so with the knowledge that he acted contrary to his best interest.

WMC's witnesses testified that Dr. Richard Wilkinson's recommendations dissuaded vulnerable people from accepting efficacious treatment. The treatments posed a risk of death to patients contracting COVID-19 because Dr. Wilkinson's pattern of prescribing ineffective treatment caused or encouraged the patients to delay obtaining

32

medically supported, potentially life-saving treatment. The WMC order details the suffering of Dr. Wilkinson's seven patients, two of whom ultimately died.

WMC's order lacks an express finding of fact that Dr. Richard Wilkinson's failure to provide his vulnerable patients appropriate care for a deadly virus created an unreasonable risk of harm to them. Nevertheless, WMC found that the information and context provided by the physician witnesses "highlighted the consequences of [Dr. Wilkinson's] actions." AR at 4999-5000. WMC also found that Dr. Wilkinson's treatment of Patients A-G caused moderate patient harm and caused a risk of severe patient harm when it determined that Tier B sanctions applied.

Although Dr. Richard Wilkinson challenges the determination that he violated RCW 18.130.180(4), he does not challenge WMC's determination that Tier B sanctions applied to him. WMC's findings and conclusions, when read as a whole, demonstrate that WMC intended to find Dr. Wilkinson's conduct created an unreasonable risk of harm to his patients as required for a violation of RCW 18.130.180(4). An appellate court may infer a finding if all the facts and circumstances in the record clearly demonstrate that the trial court intended to make and made the omitted finding. *Dalton M, LLC v. North Cascade Trustee Services, Inc.*, 2 Wn.3d 36, 54, 534 P.3d 339 (2023).

*Ames v. Medical Quality Assurance Commission*, 166 Wn.2d 255 (2009), presents a similar situation of a physician's recommending inefficacious treatment. Dr. Geoffrey

Ames led patients to believe that a biofeedback machine could diagnose and treat allergies. The FDA had not approved the device to perform either task. In fact, the machine could not diagnose or treat allergies. The Washington Supreme Court affirmed the finding of the Medical Quality Assurance Commission, the predecessor of WMC, that use of the machine placed Dr. Ames' patients at risk of harm.

When a licensing board jeopardizes a professional license, such as a medical license, the United States Constitution's due process clause demands that the agency support its decision by clear and convincing evidence. *Nguyen v. Medical Quality Assurance Commission*, 144 Wn.2d 516, 529, 29 P.3d 689 (2001). Contrary to Dr. Richard Wilkinson's position, WMC, in conclusion of law 2.2, explicitly applied a clear, cogent, and convincing evidence standard of proof to its findings.

Constitutionality of Discipline for Blog Declarations

*Preliminaries*

Before analyzing Dr. Richard Wilkinson's constitutional challenge to WMC's discipline based on his website blog, we mention contentions raised by the parties that our ruling in favor of Dr. Wilkinson render moot. We explain why we decline to address some of the theories advanced by Dr. Wilkinson.

Dr. Richard Wilkinson may contend that WMC's presiding officer erred when declaring the Commission lacked authority to hold RCW 18.130.180(1) unconstitutional.

34

Dr. Wilkinson may also argue that WMC's presiding officer blundered when declining, based on the need for clinical expertise to review the merits, to entertain his motion to dismiss. We do not address the first purported mistake because we may correct any mistake on review by directly addressing the merits of Dr. Wilkinson's argument. We do not address the second purported mistake for the same reason that this court declines to entertain a contention on appeal that the superior court erroneously denied a summary judgment motion. The denial of a summary judgment is not a final order and has no preclusive effect on further proceedings. *In re Estates of Jones*, 170 Wn. App. 594, 605, 287 P.3d 610 (2012). The denial of a summary judgment motion is not a final order that can be appealed. *In re Estates of Jones*, 170 Wn. App. 594, 605 (2012). We conserve resources and perform a fuller review by meeting headfirst the constitutional challenge to the discipline for the blogs.

Along those same lines, Dr. Wilkinson contends on appeal that the WMC hearing panel erred when refusing to entertain his constitutional challenge to the WMC position statement and the disciplinary action against him. WMC responds that the Administrative Procedure Act, chapter 34.05 RCW, precludes an agency from declaring a statute or government action unconstitutional. We agree with WMC. An administrative tribunal lacks authority to determine the constitutionality of a statute. *Yakima County Clean Air Authority v. Glascam Builders, Inc.*, 85 Wn.2d 255, 257, 534 P.2d 33 (1975).

We do not know whether this lack of authority extends to an as-applied challenge to a statute, but we need not decide this question. We rule for Dr. Wilkinson on other grounds.

Findings of fact 1.6 through 1.85 outline facts attended to Dr. Richard Wilkinson's statements on his blog. Dr. Wilkinson does not challenge any of the findings of fact. Thus, we treat those findings as truth on appeal. RAP 10.3(g); *Tapper v. Employment Security Department*, 122 Wn.2d 397, 407, 858 P.2d 494 (1993). Dr. Wilkinson instead astutely relies on the findings to confirm that WMC punishes him for speech. The heading preceding finding of fact 1.6 is "Respondent's Public Statements." AR at 4987. Through the eight paragraphs of findings, WMC references "statements," "statements on his blog," "information [spread] via his blog," "inaccurate statements," "misinformation," "false and misleading statements." AR at 4987. The findings in these paragraphs encompass no direct interactions between Dr. Wilkinson and any patient.

According to Dr. Richard Wilkinson, he challenges WMC's authority to regulate the speech on his clinical website blog both on a facial challenge and an as-applied challenge. We assume the facial challenge seeks to declare RCW 18.130.180(13), which prohibits misrepresentation or fraud in the practice of medicine, void because it contravenes the First Amendment. We also assume that Dr. Wilkinson primarily targets the position statement as being facially invalid.

A successful facial challenge invalidates the law itself. *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998). An as-applied challenge contends the law is unconstitutional as applied to the party's particular speech activity, even though the law may validly apply to others under differing circumstances. *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (1998). A successful as-applied challenge does not render the law itself invalid but just the particular application of the law. *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (1998).

WMC labels the statutes of the UDA as content neutral in part because they apply neutrally to a wide variety of licensee conduct and were adopted long before the advent of COVID-19. RCW 18.130.180(13) declares "[m]isrepresentation or fraud in any aspect of the conduct of the business or profession" to be unprofessional conduct. The statutory subsection takes no political stance as to falsehood. The statute does not target the substantive message conveyed. Therefore, we reject Dr. Wilkinson's facial challenge. WMC may apply the statute in contexts that do not entail protected speech. For example, discreet advice given by the physician directly to a patient does not garner constitutional protection. We declare RCW 18.130.180(13) unconstitutional only as it applies to Dr. Wilkinson under the circumstances on appeal.

We exclude some of the parties' arguments as irrelevant. Dr. Richard Wilkinson mentions, in his brief, that article I, section 5 of the Washington Constitution affords

37

citizens greater protection than the United States Constitution's First Amendment. *State v. Reece*, 110 Wn.2d 766, 757 P.2d 947 (1988). Nevertheless, Dr. Wilkinson fails to analyze how the Washington Constitution might grant him grander protection than the First Amendment. When discerning whether the Washington Constitution provides a level of protection higher than the federal constitution in a particular setting, courts review the six nonexclusive factors found in *State v. Gunwall*, 106 Wn.2d 54, 56, 720 P.2d 808 (1986). *State v. Young*, 123 Wn.2d 173, 179, 867 P.2d 593 (1994). When a party fails to adequately brief the *Gunwall* factors, this court will not consider whether the state constitution provides greater protection under the circumstances presented. *State v. Cantrell*, 124 Wn.2d 183, 190 n.19, 875 P.2d 1208 (1994). Thus, we analyze this appeal only under the First Amendment.

The parties dispute whether Dr. Richard Wilkinson's posting of his blog about COVID-19 on his clinic website constituted the practice of medicine as Washington law defines "practice" in RCW 18.71.011. WMC found that the blog statements, "in context[,] can only be characterized as constituting the practice of medicine." AR at 4987. Despite failing to challenge this finding, Dr. Richard Wilkinson impliedly asserts that the blog remarks do not fall into the category of practicing medicine.

We could conclude, as requested by WMC, that, for purposes of appeal, Dr. Richard Wilkinson has failed to preserve any error branding the blogs as the practice of

38

medicine.  But we consider WMC's finding of fact more of a conclusion of law because of its legal import.  Also, we may waive a court rule and reach the merits of a contention if the violation of the rule does not prejudice the respondent.  RAP 1.2(c).  WMC suffers no prejudice because, throughout the administrative proceeding against Dr. Wilkinson and in its briefing before this court, it has methodically analyzed whether the writings on the clinic blog embodied the practice of medicine.

We recognize that a finding that Dr. Richard Wilkinson's blog statements encompass the practice of medicine bolsters WMC's position that it held authority to discipline Wilkinson.  But because we rule in favor of Dr. Wilkinson on his First Amendment challenge, we need not resolve the contest as to the nature of the clinic blog. We would rule in Dr. Wilkinson's favor even if the blog qualifies as the practice of medicine.

WMC cites no case wherein the court resolved a First Amendment challenge depending on the applicable state's definition of "practice of medicine."  The United States Supreme Court has recognized in other contexts that a state's label of speech or conduct cannot be dispositive of the degree of First Amendment protection.  *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796, 108 S. Ct. 2667, 101 L. Ed. 2d 669 (1988); *National Association for the Advancement of Colored People v. Button*, 371 U.S. 415, 429, 83 S. Ct. 328, 9 L. Ed. 2d 405 (1963).  Despite not

resolving whether the publication of the blog constitutes the practice of medicine, we later analyze whether, for purposes of First Amendment review, the blog qualifies as conduct, regardless of whether or not the conduct qualifies as medical practice, such that it receives no free speech shield.

*Prior Restraint*

Dr. Richard Wilkinson characterizes the September 2021 WMC position statement as a prior restraint. Because we rule in favor of Dr. Wilkinson on other grounds, we need not address this contention. We do so anyway because the question holds public importance and may avoid later review. We generally do not review moot issues but may exercise discretion to decide an issue of substantial and continuing public interest. *Dzaman v. Gowman*, 18 Wn. App. 2d 469, 476, 491 P.3d 1012 (2021).

Prior restraints are "'official restrictions imposed upon speech or other forms of expression in advance of actual publication.'" *State v. Noah*, 103 Wn. App. 29, 41, 9 P.3d 858 (2000) (internal quotation marks omitted) (quoting *State v. Coe*, 101 Wn.2d 364, 372, 679 P.2d 353 (1984)). Unless the government restrains in advance nonprotected speech, the law presumes a prior restraint unconstitutional. *State v. Noah*, 103 Wn. App. 29, 41 (2000).

A prior restraint is an administrative or judicial order forbidding communications prior to their occurrence. *Soundgarden v. Eikenberry*, 123 Wn.2d 750, 764, 871 P.2d

1050 (1994). A prior restraint prohibits future speech, as opposed to punishing past speech. *Soundgarden v. Eikenberry*, 123 Wn.2d 750, 764 (1994). A court may annul a prior restraint even though the particular expression involved could validly be restricted through subsequent criminal punishment. *Soundgarden v. Eikenberry*, 123 Wn.2d 750, 764-65 (1994).

WMC's September 2021 position statement announces that treatments and recommendations regarding COVID-19 that fall below the standard of care may subject a physician to disciplinary action. The position statement further recognizes support for the Federation of State Medical Boards regarding COVID-19 vaccine misinformation. The statement warns physicians that WMC will scrutinize complaints received about a practitioner granting exemptions to mask and vaccine requirements to determine whether a legitimate medical reason justified the exemption. WMC grounds its action on recommendations from the FDA, the U.S. Centers for Disease Control and Prevention, and the Washington State Department of Health. Finally, the position statement reminds physicians that the FDA has not approved ivermectin or hydroxychloroquine for use in treating or preventing COVID-19.

Nothing in the WMC position statement restrains future speech by a physician on the topic of COVID-19 or treatment for the infection. The statement warns Washington physicians that WMC will hold them to the standard of care when recommending

treatment to patients but does not prohibit physicians from publicly declaring their disagreement with official COVID-19 policy statements.

When attacking the validity of the WMC position statement, Dr. Richard Wilkinson cites numerous broad propositions about prior restraints but cites no case law holding that a medical commission imposes an unconstitutional restraint when it warns a physician about violating a standard of care with his or her recommendations to a patient. Instead, Wilkinson focuses on First Amendment decisions that relate to sanctions after the utterance of the speech.

*Retaliation*

Dr. Richard Wilkinson also contends that WMC retaliated against him for his speech. He highlights that the September 2021 position statement encouraged complaints against physicians who violated the standard of care. According to Wilkinson, this statement solicited citizens to report a physician speaking against the party line as to COVID-19. Dr. Wilkinson underscores that WMC's statement of charges against him led with allegations about his website blog before listing accusations surrounding patient treatment. During the WMC hearing, a WMC witness could not recall an investigation involving speech before the promulgation of the COVID-19 position statement.

Dr. Richard Wilkinson writes as if WMC's purported retaliation against him forms a distinct defense to charges of unprofessionalism. We do not adjudge his retaliation

assertion as securing him any additional protection beyond which we afford him under the First Amendment.

### *First Amendment Analysis*

We finally move to the merits of Dr. Richard Wilkinson's constitutional challenge to his discipline stemming from comments on his clinic's website blog. A review of the merits demands that we categorize the blog messages into the genera of either conduct or speech, that we decide whether the First Amendment protects false speech, that we assess whether WMC's discipline of Dr. Wilkinson discriminates on the basis of content, that we discuss the extent of the authority of the state to protect and advance the public health, that we discern the level of scrutiny to apply to Dr. Wilkinson's First Amendment challenge to punishment for his blog, that we settle whether a licensing authority possesses a compelling or any valid interest to regulate a licensee's misleading public comments attendant to the licensee's profession, and that we resolve whether the discipline of Dr. Wilkinson sufficiently advanced any governmental interest.

We inventory the sundry arguments advanced by the parties. In favor of withstanding a constitutional attack on its discipline of Dr. Richard Wilkinson, WMC asserts that the state possesses inherent police power to proscribe conduct in order to ensure public safety. In turn, states have long recognized that physicians require state regulation because of the high level of skill, knowledge, and integrity required to practice

medicine. According to WMC, the state's power to provide for the general welfare of the community includes the power to identify and protect truth in medicine.

WMC underlines the danger of the COVID-19 world pandemic and the resulting harm to citizens who shunned the vaccine or took ivermectin. According to WMC, combating a worldwide epidemic raging in Washington State presented a compelling interest. In his website blog, Dr. Richard Wilkinson misrepresented verifiable medical facts and published incompetent medical advice. He thereby posed a serious threat to the public health and safety and sowed public distrust in the medical profession. According to WMC, its panel correctly and sagaciously found that Dr. Wilkinson's statements imperiled the well-being of the community and his individual patients.

WMC describes Dr. Richard Wilkinson's blog posts as "verbal conduct" underserving of First Amendment protection. It adds that it did not sanction Dr. Wilkinson for the content of his speech, but rather the falsity of his speech. WMC suggests that speech by doctors must be consensus driven and speech disowned by the profession as a whole contravenes fact and can be the basis of discipline in the course of a professional licensing procedure. According to WMC, it need only show a legitimate state interest when disciplining Wilkinson and some rational relationship between the interest and the discipline. Finally, WMC asks this court to create a new exception, to First Amendment protection, of empirically false scientific utterances.

44

In support of his challenge to the constitutionality of WMC's discipline for his website blog, Dr. Richard Wilkinson resolutely insists that WMC disciplined him based on the content of his speech. Dr. Wilkinson adds that discussion about public health merits broad protection by the First Amendment. The government needs a compelling interest to punish speech about health, and the government must narrowly tailor its action to serve the compelling interest. According to Dr. Wilkinson, WMC has failed to meet either component of its burden. Also, if WMC disagreed with the content of his website blog, WMC could have aired public service announcements denouncing the positions of Dr. Wilkinson as fraudulent rather than punish him. Although he does not concede that his website blog promulgated falsehood, he adds that the First Amendment protects false speech even if the speaker knows the speech to be false. Dr. Wilkinson highlights that WMC failed to prove that anyone read his blog, let alone that any patient or other member of the public took action as a result of his blog comments. Wilkinson warns that today's orthodoxy in medical science changes with new scientific advancements. We adopt these First Amendment arguments of Dr. Richard Wilkinson wholesale.

Dr. Richard Wilkinson also contends that his pronouncements on COVID-19 constituted political speech that deserves the stoutest protection under the First Amendment. The concurring opinion, not this majority opinion, addresses political speech.

45

The First Amendment confirms that the government lacks power to restrict expression because of its message, its ideas, its subject matter, or its content. *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573, 122 S. Ct. 1700, 152 L. Ed. 2d 771 (2002). As a result, we presume content-based restrictions on speech invalid. *United States v. Alvarez*, 567 U.S. 709, 716-17, 132 S. Ct. 2537, 183 L. Ed. 2d 574 (2012). We also impose on the state the burden of showing the constitutionality of any restriction. *United States v. Alvarez*, 567 U.S. 709, 717 (2012).

Critical to this appeal is the extension of First Amendment protection to false statements. *United States v. Alvarez*, 567 U.S. 709, 718 (2012). This protection is essential because some false statements are inevitable with an open and vigorous expression of views in public and private conversation, expressions the First Amendment seeks to guarantee. *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964).

In *United States v. Alvarez*, 567 U.S. 709 (2012), the United States Supreme Court struck down the Stolen Valor Act, which penalized someone for falsely claiming to be the recipient of the Congressional Medal of Honor. The government defended the statute as necessary to preserve the integrity of the medal. The government highlighted that the statute only targeted false statements and contended that false statements lack any First

Amendment value. The Supreme Court disagreed even if the defendant knowingly or recklessly uttered the false boast.

WMC suggests that speech by doctors must be consensus driven. It cites no authority for this position. The law, to the contrary, defeats this position. The First Amendment robustly protects a doctor who publicly advocates a treatment that the medical establishment considers outside the mainstream or even dangerous. *Pickup v. Brown*, 740 F.3d 1208, 1227 (9th Cir. 2014).

WMC's contention that it may monitor the scientific accuracy of physician's speech means that the State of Washington holds power to monitor speech and assess the trustworthiness of that speech. A government's power to protect truthful discourse would cast a chill on the exercise of free speech and thought. *United States v. Alvarez*, 567 U.S. 709, 723-24 (2012).

According to Dr. Richard Wilkinson, WMC's finding that his statements were false supports Wilkinson's position. It shows punishment based on viewpoint discrimination. We agree. The First Amendment reserves to the people the right to assess truth. The state has no right to protect the public against false doctrine. *Thomas v. Collins*, 323 U.S. 516, 545-46, 65 S. Ct. 315, 89 L. Ed. 430 (1945) (Jackson, J., concurring).

We deem the rule that fallacious statements receive First Amendment protection to control this appeal. Since WMC grounds its discipline of Dr. Richard Wilkinson on a claim of falsity, this sole rule could dispense of the appeal. But we also conclude that the First Amendment rule prohibiting content-based governmental action controls this appeal.

The government may impose some restrictions on speech that do not discriminate on the basis of content. A prime example of permissible restrictions is time, place, and manner restrictions. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989). WMC seeks to avoid strict scrutiny of its action by labeling its discipline as content-neutral. The Commission underscores that RCW 18.130.180 allows discipline for a physician's misrepresentation regardless of the content of the fraudulent statement. WMC highlights that the legislature adopted the statute long before the advent of COVID-19 and insists that it applies the statute dispassionately. The Commission argues that it disciplined Dr. Richard Wilkinson not because he wrote about COVID-19, vaccination, or masking, but because of his incompetence as a medical professional and his dishonesty.

We easily disagree with WMC. Content-based restrictions target speech "based on its communicative content," or apply to "particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155,

163, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015). The law considers action taken under a law that is facially content neutral to still be deemed content based if the government justifies its action with reference to the content of the regulated speech or because of disagreement with the message of the speech. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). WMC sanctioned Dr. Richard Wilkinson because the message of his blog clashed with WMC teachings.

In *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), the Ninth Circuit Court of Appeals invalidated a law that precluded a physician from discussions about marijuana with a patient, despite prescribing marijuana being a federal crime and considered dangerous. The court noted that the prohibition was content based.

We also rule in Dr. Richard Wilkinson's favor based on the balancing of governmental, societal, and First Amendment values, which the United States Supreme Court sometimes instructs us to perform. In doing so, we observe a possible inconsistency in United States Supreme Court First Amendment doctrine as to whether a court performs a balancing act when pondering First Amendment cases. On the one hand, the Supreme Court has denounced an ad hoc balancing of relative social costs and benefits of the content of speech. *United States v. Stevens*, 559 U.S. 460, 470, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010). Based on this principle, we could also summarily rule

that WMC breached Dr. Richard Wilkinson's free speech rights without any further analysis.

Contrary to the pronouncement reproving balancing, the United States Supreme Court has weighed societal values when assessing free speech disputes. According to the Supreme Court, if the state regulates or punishes the content of speech, the state must establish that it narrowly fashioned the measure to serve a compelling state interest. *TikTok Inc. v. Garland*, 604 U.S. 56, 70, 145 S. Ct. 57, 220 L. Ed. 2d 319 (2025); *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). When the government seeks to regulate protected speech, the restriction must also be the "least restrictive means among available, effective alternatives." *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 666, 124 S. Ct. 2783, 159 L. Ed. 2d 690 (2004). In short, the state's suppression of speech because of its message demands the "most exacting scrutiny." *United States v. Alvarez*, 567 U.S. 709, 724 (2012). The government encounters a heavy burden when it seeks to regulate protected speech. *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816-17, 120 S. Ct. 1878, 146 L. Ed. 2d 865 (2000).

Generally, a content-based regulation of speech is presumptively unconstitutional and subject to strict scrutiny. *National Institute of Family and Life Advocates v. Becerra*, 585 U.S. 755, 766, 138 S. Ct. 2361, 201 L. Ed. 2d 835 (2018) (*NIFLA*). Protecting the public from false speech is not a compelling government purpose. *Whitney v. California,*

274 U.S. 357, 374, 47 S. Ct. 641, 71 L. Ed. 1095 (1927); *United States v. White*, 610 F.3d 956, 960 (7th Cir. 2010). In *United States v. Alvarez*, 567 U.S. 709 (2012), the United States Supreme Court, when striking down the Stolen Valor Act, ruled that the government interest in preventing false speech did not satisfy exacting scrutiny.

WMC next contends that, even if the state cannot preclude a member of the general public from spreading false information about COVID-19, it may punish such dissemination in the context of professional licensing. The state may control speech within the context of professional licensing if such regulation is incidental to actions it may regulate, such as treatment of an individual patient. *NIFLA*, 585 U.S. 755, 771 (2018); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566-67, 131 S. Ct. 2653, 180 L. Ed. 2d 544 (2011); *Tingley v. Ferguson*, 47 F.4th 1055, 1074 (9th Cir. 2022); *Conant v. Walters*, 309 F.3d 629, 634-35 (9th Cir. 2002). For example, the state may enforce informed consent laws, which require disclosures by the physician, since the law relates to provision of a specific medical treatment. *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 884, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992), *overruled by Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 142 S. Ct. 2228, 213 L. Ed. 2d 545 (2022).

Relatedly, WMC contends that Dr. Richard Wilkinson's blog messages qualify as physician conduct that the Commission may regulate even if the conduct incidentally

involves speech. The Commission stakes a legitimate state interest in regulating the honesty and integrity of physician conduct based on RCW 18.71.010. In turn, WMC asserts a fundamental state interest in regulating integrity and truth in medicine along with clinical skill and competency. *Garcia v. Texas State Board of Medical Examiners*, 384 F. Supp. 434, 437 (W.D. Tex. 1974); *In re Revocation of License of Kindschi*, 52 Wn.2d 8, 12, 319 P.2d 824 (1958). Based on RCW 18.71.003, WMC also asserts the need to preserve the standing of the medical profession. The law has long acknowledged that acts of moral turpitude by medical professionals erode the public's trust in physicians and thereby injure public health.

According to WMC, its licensing disciplinary procedure against Dr. Wilkinson employed a neutral standard and disciplined him for his incompetence and dishonesty as a medical professional. The professional discipline procedure constituted a civil matter involving remedial sanctions, not criminal punishment. In turn, as argued by WMC, the Commission's action needed to only advance a legitimate state interest to which its measure rationally relates. *Tingley v. Ferguson*, 47 F.4th 1055, 1073, 1077-78 (9th Cir. 2022).

We agree with WMC that a state law that regulates the practice of medicine and only incidentally burdens speech is subject to only rational basis review and must be upheld if it bears a rational relationship to a legitimate state interest. *Tingley v. Ferguson*,

47 F.4th 1055, 1077 (9th Cir. 2022); *Pickup v. Brown*, 740 F.3d 1208, 1230-31 (9th Cir. 2014).  A law regulating health and welfare carries a strong presumption of validity, and the court must sustain the law if the state shows a rational basis on which the legislature could have deemed the law to serve legitimate state interests.  *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 301 (2022).  The principles asserted by WMC fail, however, in the context of Dr. Richard Wilkinson's website blog.  If discussions between a doctor and patient do not directly implicate care of that patient, the First Amendment shields the speech.  *Conant v. Walters*, 309 F.3d 629, 634 (9th Cir. 2002).

WMC cites two Ninth Circuit Court of Appeals decisions, *Tingley v. Ferguson*, 47 F.4th 1055 (2022) and *Pickup v. Brown*, 740 F.3d 1208 (2014), when advocating for a legitimate governmental interest in disciplining a physician for falsehoods that endanger the public health.  Both decisions benefit Dr. Wilkinson, however.  The two federal decisions allow the government to regulate professional therapy delivered through speech.  In the former case Washington and in the latter decision California adopted statutes precluding conversion therapy for minors.  The therapy sought to change a gay person into a heterosexual person.  The therapist delivers the treatment directly through speech and no other mechanism.  In this setting, according to the Ninth Circuit, the state could regulate speech as conduct.

A holistic reading of *Tingley v. Ferguson* and *Pickup v. Brown* shows a distinction between counseling given to a discrete client and publicly advocating for conversion therapy. In *Pickup v. Brown*, the Ninth Circuit recognized that, "a doctor who publicly advocates a treatment that the medical establishment considers outside the mainstream, or even dangerous, is entitled to robust protection under the First Amendment—just as any person is—even though the state has the power to regulate medicine." 740 F.3d at 1227. The *Pickup* court noted that while a doctor "'may not counsel a patient to rely on quack medicine'" and although the First Amendment tolerates a "substantial amount of speech regulation" within the physician-patient relationship, the First Amendment does not allow similar regulation of public physician speech. 740 F.3d at 1228 (quoting *Conant v. McCaffrey*, No. 97-00139 WHA, 2000 WL 1281174, at *13 (N.D. Cal. Sept. 7, 2000) (order) (unpublished)).

The Washington statute in *Tingley v. Ferguson* excluded from regulation speech that did not constitute conversion therapy. Psychologists remained free to communicate with the public on the subject of conversion therapy and express personal views of conversion therapy even to patients. The psychologists could even refer a minor to a counselor practicing conversion therapy under the auspices of a religious organization.

Contrary to WMC's position, the United States Supreme Court has rejected the notion that the First Amendment favors "professional speech" or speech of a member of a

54

licensed and regulated profession less than other forms of speech. *NIFLA*, 585 U.S. 755, 771 (2018). To the contrary, Court precedent has long protected the First Amendment rights of professionals. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27-28, 130 S. Ct. 2705, 177 L. Ed. 2d 355 (2010); *In re Primus*, 436 U.S. 412, 432, 98 S. Ct. 1893, 56 L. Ed. 2d 417 (1978). Regulation of professionals' speech poses the inherent risk that the government seeks not to advance a legitimate regulatory goal but to suppress unpopular ideas or information. *Turner Broadcasting System, Inc. v. Federal Communications Commission*, 512 U.S. 622, 641, 114 S. Ct. 2445, 129 L. Ed. 2d 497 (1994). Under WMC's advocacy, states would possess unfettered power to reduce a profession or occupation's First Amendment rights by imposing a licensing requirement. *NIFLA*, 585 U.S. 755, 773 (2018).

In *NIFLA*, 585 U.S. 755 (2018), the United States Supreme Court rejected the proposition that First Amendment protection turns on whether the challenged regulation falls within an occupational-licensing scheme. Accordingly, the fact that a challenged measure regulates professional conduct does not negate the measure as regulating speech. *Vizaline, LLC v. Tracy*, 949 F.3d 927, 932 (5th Cir. 2020). Instead, the court must evaluate the particular state action at issue and determine whether it targets "speech as speech" or professional conduct that happens to include speech. *NIFLA*, 585 U.S. 755, 770 (2018).

The Supreme Court has stressed the danger of content-based regulations "in the fields of medicine and public health, where information can save lives." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011). In *NIFLA*, 585 U.S. 755, 771-72 (2018), the Supreme Court listed historic examples of a government manipulation of its citizenry by controlling the speech of physicians:

> The dangers associated with content-based regulations of speech are also present in the context of professional speech. As with other kinds of speech, regulating the content of professionals' speech "pose[s] the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information." *Turner Broadcasting* [*System, Inc. v. Federal Communications Commission*], 512 U.S. [622], 641, 114 S. Ct. 2445[, 129 L. Ed. 2d 497 (1994)]. Take medicine, for example. "Doctors help patients make deeply personal decisions, and their candor is crucial." *Wollschlaeger v. Governor of Florida*, 848 F.3d 1293, 1328 (C.A. 11 2017) (en banc) (W. Pryor, J., concurring). Throughout history, governments have "manipulat[ed] the content of doctor-patient discourse" to increase state power and suppress minorities:
>
> > "For example, during the Cultural Revolution, Chinese physicians were dispatched to the countryside to convince peasants to use contraception. In the 1930s, the Soviet government expedited completion of a construction project on the Siberian railroad by ordering doctors to both reject requests for medical leave from work and conceal this government order from their patients. In Nazi Germany, the Third Reich systematically violated the separation between state ideology and medical discourse. German physicians were taught that they owed a higher duty to the 'health of the Volk' than to the health of individual patients. Recently, Nicolae Ceausescu's strategy to increase the Romanian birth rate included prohibitions against giving advice to patients about the use of birth control devices and disseminating information about the use of condoms as a means of

> preventing the transmission of AIDS." [Paula] Berg, *Toward A First Amendment Theory of Doctor-Patient Discourse and the Right To Receive Unbiased Medical Advice*, 74 B.U. L. REV. 201, 201-202 (1994) (footnotes omitted).
>
> Further, when the government polices the content of professional speech, it can fail to "'preserve an uninhibited marketplace of ideas in which truth will ultimately prevail.'" *McCullen v. Coakley*, 573 U.S. 464, 476, 134 S. Ct. 2518, 2529, 198 L. Ed. 2d 502 (2014). Professionals might have a host of good-faith disagreements, both with each other and with the government, on many topics in their respective fields. Doctors and nurses might disagree about the ethics of assisted suicide or the benefits of medical marijuana; lawyers and marriage counselors might disagree about the prudence of prenuptial agreements or the wisdom of divorce; bankers and accountants might disagree about the amount of money that should be devoted to savings or the benefits of tax reform. "[T]he best test of truth is the power of the thought to get itself accepted in the competition of the market," *Abrams v. United States,* 250 U.S. 616, 630, 40 S. Ct. 17, 63 L. Ed. 1173 (1919) (Holmes, J., dissenting), and the people lose when the government is the one deciding which ideas should prevail.

(Some alterations in original.)

Dr. Richard Wilkinson offered no medical treatment through his public blog statements. WMC could constitutionally discipline Dr. Wilkinson for his prescribing ivermectin to COVID patients, for his failure to disclose relevant information to patients about ivermectin, and for his violation of the standard of care when directly advising a patient to shun COVID-19 vaccines. WMC could not regulate Dr. Wilkinson's speech on his website blog when he preached the same themes.

We conclude that the state must and has failed to show a compelling interest in disciplining Dr. Richard Wilkinson for his website blog. But we also conclude that

57

WMC has not satisfied its burden of showing strict necessity in punishing Wilkinson's speech to advance its interest.

The state's identification of a compelling interest does not end First Amendment inspection. The First Amendment requires that the government's chosen restriction on speech be "actually necessary" to achieve its interest. *Brown v. Entertainment Merchants Association*, 564 U.S. 786, 799 (2011). The restriction imposed must directly curb the harm allegedly caused by the speech. *Entertainment Merchants Association*, 564 U.S. 786, 799, 131 S. Ct. 2729, 180 L. Ed. 2d 708 (2011). WMC showed no harm resulting from Dr. Richard Wilkinson's posts.

Supreme Court precedent suggests that, even assuming the state establishes a strict link between its compelling interest and measure to further that interest, the government still carries the burden of demonstrating that counterspeech would not suffice to achieve its interest. *United States v. Alvarez*, 567 U.S. 709, 726 (2012). For example, WMC could have engaged in a public information campaign promoting the vaccine and condemning the use of ivermectin. WMC presented no evidence of whether it had engaged in opposite speech and the impact of this speech.

Finally, WMC asks us to fashion a new narrow exception for a physician's knowing misrepresentations of verifiable medical facts. The Commission primarily substantiates this request based on dicta in *United States v. Alvarez*, 567 U.S. 709 (2012),

58

that the Supreme Court may not protect some forms of speech historically lacking constitutional protection. The Court further declined to delineate an exhaustive list of modes of speech circumventing First Amendment shelter and left open the possibility of new exceptions beyond the stated exemptions of obscenity, fighting words, conspiracy to commit a crime, slander, and true threats. *United States v. Alvarez*, 567 U.S. 709, 717-18 (2012).

WMC asserts that acts of moral turpitude and misrepresentations by physicians do not further public discourse and instead endanger public health and safety. Therefore, verifiable false publications by a physician deserve no constitutional protection. The consequences of the spread of COVID-19 misinformation during the COVID-19 pandemic enhances the need to create an exception.

We doubt this clodhopper court holds the status to create exceptions to the First Amendment. We decline to do so. WMC provides no authority supporting its postulation of a long tradition of regulating false speech by physicians outside of the physician-patient relationship. To the contrary, we have analyzed decisions that express concern about regulating physician speech, even if the speech advocates for treatments not generally accepted by the medical community. In *United States v. Alvarez*, 567 U.S. 709 (2012), the high Court expressly rejected the argument that false speech should fall in a general category of presumptively unprotected speech under the First Amendment.

The Commission cites no case law recognizing the government has a substantial governmental interest in protecting the public from physician speech, whether false or not, or preserving the integrity of the profession by regulating such speech. The Supreme Court has not recognized a legitimate governmental interest in the regulation of physician speech outside of the physician-patient relationship.

Sanctions

Neither party addresses whether this court should affirm the imposed sanctions in the event the court affirms the violation of RCW 18.130.180(4) based solely on Dr. Richard Wilkinson's treatment of patients. Stated differently, neither party addresses what sanctions should be imposed if this court reverses the alleged violations based on the blog posts. Our affirmation of WMC's determination that Dr. Wilkinson violated RCW 18.130.180(4) in his care for Patients A-G by itself supports the Commission's determination that Tier B sanctions apply. Thus, we could affirm the imposition of those sanctions based solely on the violation of RCW 18.130.180(4). Nevertheless, given WMC's broad discretion in ordering sanctions and given that we have reversed an important portion of the action taken against Dr. Wilkinson, we remand to the Commission to reconsider the sanctions to impose.

Dr. Richard Wilkinson also contends that WMC violated his due process rights when requiring him to submit to a physical, cognitive and psychological screening. He

complains that the statement of charges served on him did not warn him of these possible sanctions. He also contends that the Commission holds power to order such testing only as part of its investigation, not as discipline. On remand, Dr. Wilkinson may advance these arguments assuming WMC intends to again order such testing.

## CONCLUSION

We affirm WMC's discipline of Dr. Richard Wilkinson based on his violations of the standard of care when treating Patients A through G. We reverse and dismiss the charges brought against Dr. Wilkinson for his clinic's website blog comments.

We remand to the Commission to readdress what sanctions to impose on Dr. Wilkinson.

_____
Fearing, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Staab, J.

No. 40061-1-III

FEARING, J. (concurring) —

Our constitutional tradition stands against the idea that we need
Oceania's Ministry of Truth. See G[eorge] Orwell, Nineteen Eighty-Four
(1949) (Centennial ed. 2003). *United States v. Alvarez*, 567 U.S. 709, 723,
132 S. Ct. 2537, 183 L. Ed. 2d 574 (2012).

Dr. Richard Wilkinson emphasizes that the Washington Medical Commission

(WMC) disciplined him for political speech. He adds that political speech enjoys special

protection under the First Amendment to the United States Constitution. I agree with

both of his comments to the extent he references his blog writings. I write this

concurring opinion in part because, in today's incendiary political environment, I would

prefer to promote the importance of protecting political speech, including protests, and

rest our decision on the First Amendment's neutral treatment of political speech. While

the panel members unanimously agree that the First Amendment protected Dr.

Wilkinson's blog postings, my two colleagues do not join in this concurring opinion.

Dr. Raymond McClelland, WMC's expert, testified that opinions about COVID

and treatment of COVID reveal the speaker's political affinities. During the COVID-19

pandemic, one political party embraced pro-ivermectin, anti-masking, and anti-vaccine

stances. The debate over the seriousness of COVID-19 and what constituted effective

COVID-19 treatments deserted the tether of science and curved political. *See, e.g.*, Dorit Rubinstein Reiss, *Politicization of Science*, HUMAN RIGHTS MAGAZINE (June 14, 2021), https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/the -truthabout-science/politicization-of-science/; Michael Specter, *How Anthony Fauci Became America's Doctor*, NEW YORKER (Apr. 10, 2020), https://www.newyorker.com/ magazine/2020/04/20/how-anthony-fauci-became-americas-doctor.  The politicalization of this public health subject confirms that WMC centered its chastisement of Dr. Richard Wilkinson's posts on the viewpoint expressed.  WMC presumably would have initiated no discipline against Wilkinson for his clinic's website had his posts emphasized the seriousness of the pandemic, encouraged patients to receive the vaccine, and praised officials for the government's response to the COVID scourge.

I recognize that a speaker's opinion can be both political and scientific in nature. Nevertheless, assuming Dr. Richard Wilkinson's blogs dipped in part into the cabin of science, its other nature, the political nature of his COVID statements, bolsters his position that WMC could not discipline him for the publication of his opinions.  The First Amendment offers its strongest protection to speech for political purposes. *New York Times Co. v. Sullivan*, 376 U.S. 254, 269, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964).  United States Supreme Court First Amendment precedent has created a rough hierarchy in the constitutional protection of speech in which core political speech occupies the highest, most protected position. *Snyder v. Phelps*, 562 U.S. 443, 452, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011).  Our nation adopted the First Amendment to ensure unfettered

interchange of ideas for the generation of political and social changes desired by the people. *Roth v. United States*, 354 U.S. 476, 484, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957). The First Amendment recognizes political protest as a means of preserving democracy and affording a release for grievances against the government. *Cox v. Louisiana*, 379 U.S. 559, 574, 85 S. Ct. 476, 13 L. Ed. 2d 487 (1965).

The government not only lacks power to discipline political speech, regulation of such speech wreaks harm on the nation. Suppression of speech by the government can make exposure of falsity more difficult, not less so. *United States v. Alvarez*, 567 U.S. 709, 728 (2012). The discipline of Dr. Richard Wilkinson by WMC likely fed suspicion in those segments of the populace who deemed COVID-19 a scam and who reckoned the vaccine a means of seeding woke viruses into patriotic Americans. WMC's directive to Dr. Wilkinson to undergo a psychological evaluation likely went further and fueled conspiracy theories. The directive for an evaluation echoed the Soviet Union's diagnosing of dissidents as suffering from a psychiatric disorder. SIDNEY BLOCH & PETER REDDAWAY, RUSSIA'S POLITICAL HOSPITALS: THE ABUSE OF PSYCHIATRY IN THE SOVIET UNION 424 (1977).

In a free society, the best remedy for deceiving speech is not punishment for, or stifling of, the speech, but speech that is true. *United States v. Alvarez*, 567 U.S. 709, 727 (2012). To employ verse, the response to the unreasoned is the rational; to the uninformed, the enlightened; to the straight-out lie, the simple truth. *United States v. Alvarez*, 567 U.S. 709, 727 (2012). The remedy to be applied is more speech, not

3

enforced silence. *Whitney v. California*, 274 U.S. 357, 377, 47 S. Ct. 641, 71 L. Ed. 1095 (1927) (Brandeis, J., concurring). Only a weak society needs government protection or intervention when it seeks to preserve the truth. *United States v. Alvarez*, 567 U.S. 709, 728-29 (2012).

To sanction Dr. Richard Wilkinson for his blog, WMC, under Washington statute, needed to demonstrate that the blog's messages placed his patients at risk. Because of the politicalization of COVID-19, I wonder how WMC could prove that any Washington State citizen, let alone a patient of Dr. Wilkinson, took ivermectin or failed to receive a COVID-19 vaccine because of false information spread by one licensed physician on his clinic's website when this information spread like photons through the electromagnetic spectrum during the height of the pandemic. Some members of the medical profession broadcasted the disinformation, but politicians and political pundits led the dissemination. Even a President of the United States, despite boasting of his administration's fast action in developing a COVID vaccine, promoted use of off-label treatment for COVID-19 and fostered criticism by his supporters toward the government agencies seeking to curb the pandemic. The President went further and publicly ruminated about injecting disinfectant into human lungs to kill the coronavirus. A medical commission should reticently chasten a physician for speech promoted by the leader of our nation.

In addition to writing this concurring opinion to promote the First Amendment's protection of political speech, I write this separate opinion from an alarm and sadness over political partisanship crumpling the bipartisan and nonpartisan nature of the First

Amendment. In this era of an unrestrained and unrelenting political divide in the United States, this blue state court's decision teaches an important lesson by reversing sanctions against Dr. Richard Wilkinson for his website blog touting a red state message. The lesson is the neutral temperament of the First Amendment. The First Amendment equally blankets the dissemination of anarchist, libertarian, communist, socialist, progressive, liberal, Democratic Party, Republic Party, conservative, regressive, fascist, and even Nazi viewpoints. The drafters of the Bill of Rights intended the amendment to protect all popular and unpopular speech, orthodox or heretical views, sublime or profane utterances, and provocative or banal messages. Unfortunately, political partisans increasingly refuse to recognize the nonaligned nature of the First Amendment and reject the idea that doctrinal opponents enjoy free speech rights. More and more, the exercise of free speech triggers violence, and, conversely, this bloodshed frightens many from the exertion of First Amendment rights.

The First Amendment to the United States Constitution arises from Enlightenment teachings and specifically from the English Enlightenment philosopher John Locke. Locke promoted fundamental and inalienable individual rights such as freedom of religion and speech. Most Americans consider an inalienable right to be bestowed by God. Locke renounced the view that religious and political orthodoxy can be forced. He sermonized that a free press was essential to the flourishing of society. A quarter century earlier, John Milton promoted the usefulness of all books, even scandalous, seditious, and libelous texts because bad books allow a discreet and judicious reader to discover,

confute, forewarn, and illustrate. The American revolutionary generation, including the framers of the United States Constitution and the Bill of Rights, drew ideas of government from John Locke.

Both John Locke and John Milton came of age, in the mid-1600s, during the turbulent English Civil War. The war between Royalists and Parliamentarians arose over deep-seated divisions in politics, religion, and economic policy. The Civil War pitted father against son and brother against brother. 200,000 English people indirectly or directly lost their lives during the war. Locke and Milton correctly concluded that denial of freedoms of speech, association, and religion inevitably resulted in social division and vicious conflict.

Historians see a similar disunion in American society today that places the country on the brink of a civil war. Radicalized politics spawns support for violence against philosophical opponents. Extreme views divide family members. High profile politicians and pundits suffer bloodshed—the sniper death of Charlie Kirk, the assassination attempt on Donald Trump, the murder of Israeli Embassy staff, the mass shooting at a Congressional baseball game, the gunning of Gabby Giffords with the accompanying death of six, the murder of Minnesota House Speaker Emerita Melissa Hortman and her husband Mark, the attended injuries to Minnesota Senator John Hoffman and his wife, the hammer pummeling of Paul Pelosi, and the bashing of United States Capitol police on January 6, 2021. Shootings of targeted racial minorities add to the turmoil—the anti-Black mass shooting and death of nine during a Charleston church

Bible study, and the multiple murder of ten African-Americans at a Buffalo supermarket. Young people wonder about the safety and utility of public discourse.

The First Amendment, needed now more than ever, precludes the majority from prohibiting dissemination of social, economic, religious, and political doctrine believed to be false and fraught with evil consequence. Those who won white men's independence believed that the final end of the state was to make men free to develop their faculties and that in its government the deliberative forces should prevail over the arbitrary. According to United States Supreme Court Justice Louis Brandeis:

> They [the drafters of the First Amendment] believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed.
> . . . .
> Those who won our independence by revolution were not cowards. They did not fear political change. They did not exalt order at the cost of liberty.

7

*Whitney v. California*, 274 U.S. 357, 375-77, 47 S. Ct. 641, 71 L. Ed. 1095 (1927) (Brandeis, J., concurring), *overruled by Brandenburg v. Ohio*, 395 U.S. 444, 89 S. Ct. 1827, 23 L. Ed. 2d 430 (1969).

To echo some of the themes espoused by Justice Louis Brandeis, free speech recognizes the autonomy and dignity of each individual. To paraphrase Hannah Arendt, denial of one person's right to free speech renders that person superfluous and subject to isolation, if not elimination. The government's silencing of its citizenry impedes progress and robs a nation of its humanity.

Free speech, in addition to exalting individual liberty, renders government officials accountable to the people. The First Amendment fosters transparency and helps to stem government corruption. The First Amendment remains essential to democracy, and free and fair elections. Partisan employment of the First Amendment widens the divide between political factions.

In the last half decade, we have seen the rise of despots or the continuation of dictatorships in Algeria, Azerbaijan, Belarus, Cambodia, China, the two Congos, Cuba, Egypt, Hungary, Iran, Jordan, Kazakhstan, Kyrgyzstan, Libya, Myanmar, Nicaragua, North Korea, Russia, Saudi Arabia, Somalia, Sudan, Tajikistan, Turkey, Turkmenistan, and Venezuela. Free speech and protests play an imperative role in preventing and ending such dictatorships. For this reason, an autocratic regime seeks to neutralize thought leaders who think differently from it and gag institutions that thrive under the protection of a constitution's free speech proviso. These institutions include universities,

legislatures, courts, nonprofit advocacy organizations, lawyers, and the press. Universities spread enlightenment and foster a marketplace of ideas. Nongovernmental organizations seek justice for all. The legislature acts democratically and maintains a strong representation from the opposition party. The press asks annoying questions, probes for documents, demands openness, and combats corruption endemic with secrecy. Courts enforce individual rights. Lawyers litigate citizen's free speech rights.

A left-wing or right-wing despot not only employs law enforcement officers and other government officials to intimidate citizens through police action and legal measures but also utilizes his prestigious pulpit with endless broadcasts that hurl clever insults, invective innuendoes, and official lies at taxpayer expense. This bullying martinet demonizes university professors and administrators, contrarian politicians, judges, justice advocates, protestors, and attorneys as unchristian, anti-Islamic, foreign, poisonous, vicious, anti-majoritarian, treasonous, and unpatriotic. This leader accuses someone who opposes his agenda as a communist, fascist, terrorist, terrorist financier, lunatic, and liar. He mouths silly and demeaning nicknames for those who seek to curb his power. The authoritarian leader denounces the free press as fake news. Ironically, this governing despot decries that his opponents have far too long denied him and his supporter's free speech rights despite he and his acolytes having always exercised the right to free speech without any encumbrance from the government. He and his supporters imagine their rights to have been violated because others aggressively denounced their opinions or their ideas temporarily did not prevail in governing circles.

9

Most United States presidential administrations, beginning with John Adams' administration, have thwarted to varying degrees the First Amendment. In 1798, at the urging of President Adams, Congress adopted the Sedition Act, which led to prosecution of journalists for publishing false or malicious information about the federal government. More recently, officials of the Joseph Biden administration regularly contacted major American social media companies and urged the platforms to remove disfavored content and accounts from their sites. The targeted content included information on the COVID-19 lab leak theory, pandemic lockdowns, vaccine side effects, election fraud, and the Hunter Biden laptop story. In a suit brought by several states, the United States Circuit Court of Appeals characterized the contact between the Biden administration and the media platforms as coercion that violated the First Amendment. *Missouri v. Biden*, 83 F.4th 350 (5th Cir. 2023). The United States Supreme Court vacated the ruling for lack of standing. *Murthy v. Missouri*, 603 U.S. 43, 144 S. Ct. 1972, 219 L. Ed. 2d 604 (2024).

Presidential and gubernatorial administrations come and go, but the First Amendment remains. I hope. Not for more than two hundred years has any President sought to destroy the First Amendment as our current national leader has. After a four-year absence, a President of the United States, who disagrees with Dr. Richard Wilkinson that political speech burnishes as the zenith in the constellation of rights, has returned to the highest office. This President operates under an authoritarian and retributive agenda that trashes the First Amendment rights of those who criticize him or who support causes with which he disagrees. This President loathes the nonpartisan nature of the First

10

Amendment.  His recent actions prove that he has never valued the purposes and goals behind the First Amendment, if not the entirety of the United States Constitution.

The current President has undertaken multiple and increasing steps to thwart the First Amendment.  On April 23, 2024, during the presidential campaign, our President declared:

> [T]he time has come to reclaim our once great educational institutions from the radical left.  And we will do that.  The accreditors are supposed to ensure that schools are not ripping off students and taxpayers, but they have failed totally. . . .  I will fire the radical left, accreditors that have allowed our colleges to become dominated by Marxist maniacs and lunatics.  We will then accept applications for new accreditors who will impose real standards on colleges once again, and once and for all.  [These standards will include] defending the American tradition and Western civilization, protecting free speech, eliminating wasteful administrative positions that drive up costs, incredibly.

Brooke Singman, *Trump Says He'll "Fire the Radical Left" from Colleges, Focus on "Defending" American Tradition if Elected*, FOX NEWS (Apr. 23, 2024, 7:24 PM), https://www.foxnews.com/politics/trump-says-hell-fire-radical-left-from-colleges-focus-on-defending-american-tradition-if-elected.

The current presidential administration punishes Harvard University, the nation's oldest university, with funding cuts, federal investigations, and limits on visas for international students because of the school's alleged woke educational agenda.  The administration characterizes the university as a mismanaged well of bigotry.  This Spring the federal government stripped Harvard of billions of dollars in research funding.  The government insisted that Harvard end any program that advances diversity, equity, and

11

inclusion, and permit an outside auditor to monitor academic departments most ideologically captured. The Justice Department initiated an investigation against Harvard University for alleged fraud. Although a federal judge in Boston blocked the effort, the federal government sought to bar international students from the university. Michael S. Schmidt & Alan Blinder, "*Harvard and Trump Administration Restart Talks to End Their Bitter Dispute*," NEW YORK TIMES (June 22, 2025).

After taking office, our President withheld more than $400 million in funding from another Ivy League school, Columbia University. As a condition for restoring the funds, the President demanded sweeping changes to university protest policies, security, and the Middle Eastern Studies Department. In turn, Columbia's interim President Katrina Armstrong announced the university would accede to the President's demands. Columbia University appointed a 36-member internal security force of "special officers" who can arrest or remove people from campus. The university banned face masks and now requires anyone participating in demonstrations to present university identification to a public safety officer when asked. The university appointed a senior vice provost to conduct a "thorough review" of the Center for Palestine Studies; the Institute for Israel and Jewish Studies; the Middle Eastern, South Asian, and African Studies Department; the Middle East Institute; and the School of International and Public Affairs Middle East Policy. Brady Knox, "*Columbia Agrees to Trump Administration Demands After Federal Funding Was Pulled*," WASHINGTON EXAMINER (March 21, 2025). One week

after yielding to the President's threat, interim President Katrina Armstrong resigned her position.

Justice Felix Frankfurter noted the dependence of a free society on free universities. A university needs independence to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study. *Sweezy v. New Hampshire*, 354 U.S. 234, 262-63, 77 S. Ct. 1203, 1 L. Ed. 2d 1311 (1957) (plurality opinion) (Frankfurter, J., concurring in result).

In February, federal immigration authorities detained Mahmoud Khalil, a Columbia graduate and campus activist. Khalil, a legal permanent United States resident, faces deportation for his role in 2024 campus protests. Khalil's lawyer declared that Khalil was exercising free speech rights to demonstrate in support of Palestinians in Gaza and against United States support for Israel. Our President has repeatedly alleged, without evidence, that Khalil supports Hamas. On June 20, a federal judge released Khalil from detention because the government jailed him for his speech. Jonah Bromwich & Luis Ferre-Sadurni, "*Freed from Detention, But Not from Threats*," NEW YORK TIMES (June 22, 2022); Max Matza, "*Columbia University President Resigns Amid Trump Crackdown*," BBC NEWS (March 28, 2025).

In March, masked immigration officials arrested Georgetown University professor Badar Khan Suri outside his home, despite no accusation of criminal conduct. Khan Suri criticized Israel for its actions in Gaza. According to Khan Suri, Immigration and Customs Enforcement agents scuttled him from one detention center to another center.

13

Officers chained his ankles and wrists as if he was subhuman. He was not allowed to communicate with his family or lawyers. On May 14, 2025, United States District Court Judge Patricia Tolliver Giles ordered the release of Khan Suri because the government failed to provide any evidence of his threat as a national security risk. Judge Giles ruled that his detention violated the First Amendment right to free speech. Drew Wilder, "*Georgetown Scholar Released from ICE Detention*," NBC NEWS (May 14, 2025).

Across the nation, the State Department has revoked the visas of three hundred international students for protesting Palestine. The President tweets on Truth Social that these students engage in illegal protests. Protests, which by nature criticize those in power, are not illegal absent violence or threats of violence. Insultingly, incongruously, spitefully, callously, and mockingly, the President of the United States praises and promotes, parades and pardons protestors who entered the United States Capitol Building by hammering police officers, smashing windows, threatening the lives of legislators, chanting to hang the Vice President of the United States, and decorating and desecrating our center of democracy with scat, while he authorizes arrests by masked muggers of those exercising First Amendment rights by peacefully protesting Palestine or calmly marching against the strong measures of Immigration and Customs Enforcement agents.

Our current President refuses to answer legitimate questions posed by reporters and attacks inquiring journalists as unfair and stupid. On May 25, 2025, the President angrily labeled NBC News journalist Peter Alexander as a "terrible reporter" and a "disgrace" for questioning his decision to accept a Qatari jet. The President also

threatened an investigation into NBC's parent company Comcast. The Federal Communications Commission, run by the President's acolyte Brendan Carr, has opened investigations into the President's nemeses ABC and NBC over diversity, equity, and inclusion policies. Corbin Bolies, "*Trump Snaps at Reporter in Surreal Oval Office Meltdown*," DAILY BEAST (May 21, 2025).

On his first day of office, the current President signed an executive order renaming the "Gulf of Mexico" to the "Gulf of America." In response, the Associated Press declared that, because the Gulf of Mexico has borne that name for 400 years, its organization would continue to use the appellation. In retaliation, the White House blocked Associated Press reporters from the Oval Office and Air Force One. On April 8, 2025, United States District Court Judge Trevor N. McFadden, a President Trump appointee, ruled that the White House acted against the First Amendment's prohibition on viewpoint discrimination, when blocking the longtime news organization's access over its refusal to use the term "Gulf of America." McFadden ruled the White House must restore Associated Press's press access. Lindsay Kornick, *Federal Judge Rules White House's Associated Press Ban Unconstitutional for Viewpoint Discrimination*, FOX NEWS (April 8, 2025).

In February, the President retaliated against Washington law firm Covington & Burling by stripping the security clearances of lawyers and other personnel who gave legal services to Jack Smith, the federal prosecutor who brought criminal charges against the President. Next, the President suspended security clearances for the Seattle-based law

firm Perkins Coie, which regularly represents Democratic groups, including the Democratic National Committee. When Judge Beryl Howell restored the clearances, the Justice Department sought to remove Howell from the lawsuit. Ali Blanco, *Trump Hangs Sword of Damocles over the American Legal System*, POLITICO (March 22, 2025).

In March, the President suspended security clearances of lawyers at New York firm Paul, Weiss because of the firm's association with Mark Pomerantz, who investigated Trump at the Manhattan District Attorney's Office. After the presidential administration also limited the firm's access to government buildings and prevented the law firm from receiving federal contracts, Paul, Weiss surrendered and promised the President to abandon its diversity policies, provide free legal representation to clients with a full spectrum of political viewpoints, and offer free legal services to some of the President's favored initiatives. Ali Blanco, *Trump Hangs Sword of Damocles over the American Legal System*, POLITICO (March 22, 2025).

Our current President criticizes federal judges who rule against him. When United States District Court Judge James Boasberg ruled that Venezuelan men should not be deported to El Salvador without a hearing, the President responded by tweet:

> Unlawful Nationwide Injunctions by Radical Left Judges could very well lead to the destruction of our Country! These people are Lunatics, who do not care, even a little bit, about the repercussions from their very dangerous and incorrect Decisions and Rulings. He is a local, unknown Judge, a Grandstander, looking for publicity, and it cannot be for any other reason, because his "Rulings" are so ridiculous, and inept. SAVE AMERICA!

Michael Katz, *Trump Says "Radical Left" Federal Judges Harming Nation*, Newsmax (March 20, 2025). Trump called for the impeachment of Judge Boasberg.

Unknown individuals have sent pizzas to federal judges' home addresses to menace them. One pizza arrived at the home of United States District Court Judge Esther Salas under the name of Daniel Anderl, the judge's son who was killed by a disgruntled gunman targeting Salas. Scott McFarlane & Jacob Rosen, *Federal Judges Targeted Nationwide by Pizza Doxxings*, CBS News (May 13, 2025). Judges increasingly receive threats for rulings issued unfavorable to the presidential administration. Alexandra Duggan, *Spokane County Judges Reaffirm Their Constitutional Oath, Condemn Politicization and Bending of Rule of Law*, Spokesman Review (Spokane) (May 2, 2025); Donna Gordon Blankinship, *Trump Is Stress Testing the Nation's Courts*, Washington State Standard (June 26, 2005); David French, *This Is No Way to Run a Country*, New York Times (August 7, 2025). Attacks on the judiciary impede the checks and balances intended by the framers of the United States Constitution. The sidelining of the judiciary permits rule by political power and brute force rather than by law. Other judges warn, both inside and outside the context of written rulings, of a clear and present danger to the judiciary and the rule of law by the current administration. Ashleigh Fields, Wall Street Journal *Hammers DOJ over Bolton Raid: Trump "The Real Offender Here*," The Hill (August 23, 2025); David French, *This Is No Way to Run a Country*, New York Times (August 7, 2025); Carrie Johnson, *Federal Judges Facing Threats After Ruling Against the Trump Administration Speak Out*, NPR's All Things

CONSIDERED (August 4, 2025); Jacob Knutson, *It's Just So Disgusting: Judges Warn of Rising Threats As Trump Steps Up Attack on Courts*, DEMOCRACY DOCKET (August 1, 2025); Donna Gordon Blankinship, *Trump Is Stress Testing the Nation's Courts*, WASHINGTON STATE STANDARD (June 26, 2005); Josh Gerstein, *Rule of Law is 'Endangered,' Chief Justice Says*, POLITICO (May 12, 2025); Alexandra Duggan, *Spokane County Judges Reaffirm Their Constitutional Oath, Condemn Politicization and Bending of Rule of Law*, SPOKESMAN REVIEW (Spokane) (May 2, 2025); April Rubin, *Trump's War on Lawyers and Judges Draws Rebuke from Dozens of Advocacy Groups*, AXIOS (April 3, 2025); Ivan Pereira & Peter Charalambous, *Several Federal Judges Have Slammed the Trump Administration. Here's What They Have Said in Court*, ABC NEWS (March 25, 2025); Justin Baragona, *Fox News Host Swipes at GOP for Railing Against Judge Over Deportation Order After Praising Him in the Past, 'So You Can't Pick and Choose What Day You Like a Judge and What Day You Don't!' Trey Gowdy Declared on Monday*, INDEPENDENT (U.K.) (March 17, 2025); Charles Toutant, *Judges and Lawyers Speak Out Amid Trump Attacks*, LAW.COM (March 13, 2025); Mark Sherman, *2 Senior Judges, Appointed by Republicans, Speak Out About Threats Against Federal Judiciary*, WASHINGTON TIMES (March 12, 2025); Joan Biskupic, *Growing Judicial Voices Challenge Trump's Erosion of Constitutional Norms*, CNN (March 10, 2025).

On June 12, 2025, Homeland Security Secretary Kristi Noem conducted a press conference in Los Angeles. Noem declared that federal authorities were not leaving Los Angeles but would instead increase operations to "liberate" the city from its "socialist"

18

leadership. In response, California United States Senator Alex Padilla shouted: "I'm Senator Alex Padilla. I have questions for the secretary." A Secret Service agent immediately grabbed Padilla's jacket and pushed Padilla from the room and into a hallway. Outside the room, officers pushed Padilla to the ground, handcuffed him, and straddled him. The Department of Homeland Security later falsely claimed that agents thought Padilla was an attacker because he did not identify himself. Krysta Fauria et al., *Sen. Padilla Is Forcefully Removed from Noem's News Conference on Immigration Raids and Handcuffed*, ASSOCIATED PRESS NEWS (June 12, 2025). Attacks on members of Congress impede the checks and balances intended by the framers of the United States Constitution.

In the face of violence against his adherents, the present president, instead of elevating tolerance and preaching liberty of thought and freedom of speech, weaponizes the deaths and injuries for political gain. He immediately demonizes an unidentified "them," meant to refer to anyone who opposes his agenda. He does not then concede the existence of good people who hold liberal political views. When his followers commit violent acts and even kill peaceful opponents, he, on the stated reason of a need to review the facts first, reserves remarks. Then he comments: "you also had people that were very fine people, on both sides." He trademarks as "patriots" those who rioted at the United States Capitol, which insurgence led to the deaths of a protestor and law enforcement officers.

As one who daily suffers from long-COVID, I, with a weak body and voice, disagree with Dr. Richard Wilkinson's assertion that COVID-19 has been a scam. As one whose life may have been saved by the COVID vaccine, I shudder at Dr. Wilkinson's denouncement of the vaccine. As a student of history, I cringe at Wilkinson's comparison of the administration of the vaccine to the Jewish Holocaust. But with a strong pen, I, as a judge, endorse, guard, and uphold the United States Constitution, the Bill of Rights, the First Amendment, nonpartisanship, consistency, fairness, justice, tolerance, respect, and common decency. As a judge, I have performed my solemn and sworn duty to protect Dr. Richard Wilkinson's right to voice his views. The President of the United States also pledges an oath to "preserve, protect and defend the Constitution of the United States." U.S. CONST. art. II, § 1.

Despite disagreement with his views, I applaud Dr. Richard Wilkinson for enforcing at substantial cost his free speech rights. I wish our current President held the same devotion to the First Amendment as does Dr. Wilkinson. I encourage Dr. Wilkinson and all Washingtonians to recognize, as this concurring opinion has, the nonpartisan nature of the First Amendment and to condemn the violations of the First Amendment by any President who bestows free speech protections only on his votaries.

History teaches that the silencing of one leads to the silencing of many and oftentimes the muzzling of all.

_____
Fearing, J.